**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NOTHERN DISTRICT OF OHIO**
**EASTERN DIVISON**

| | | |
|---|---|---|
| AIRICA STEED, ED.D. | ) | CASE NO. 1:25-CV-00443-PAB |
| 31251 Ainsworth Drive | ) | |
| Pepper Pike, OH 44124 | ) | |
| | ) | JUDGE: PAMELA A. BARKER |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **AMENDED COMPLAINT** |
| THE METROHEALTH SYSTEM | ) | |
| 2500 MetroHealth Drive | ) | |
| Cleveland, Ohio 44109 | ) | **JURY DEMAND ENDORSED** |
| | ) | **HEREON** |
| -and- | ) | |
| | ) | |
| JOHN MOSS | ) | |
| 2457 West 11th Street | ) | |
| Cleveland, OH 44113 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| TAMIYKA ROSE | ) | |
| 2500 MetroHealth Drive | ) | |
| Cleveland, Ohio 44109 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| E. HARRY WALKER, M.D. | ) | |
| 4005 Som Center Rd. | ) | |
| Moreland Hills, OH 44022 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| LAURA MCBRIDE, | ) | |
| 1115 Forest Rd. | ) | |
| Lakewood, OH 44107 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| SONJA RAJKI, | ) | |
| 2170 North Saint James Pkwy | ) | |
| Cleveland Heights, OH 44106 | ) | |
| | ) | |

```
-and-                                        )
                                             )
SARAH PARTINGTON                             )
2500 MetroHealth Drive                       )
Cleveland, Ohio 44109                        )
                                             )
-and-                                        )
                                             )
ROBIN BARRE                                  )
2500 MetroHealth Drive                       )
Cleveland, Ohio 44109                        )
                                             )
                        Defendants.          )
```

Plaintiff Airica Steed ("Steed" or "Plaintiff") herein, by and through undersigned counsel, hereby alleges and states for her Complaint against Defendants, the MetroHealth System ("MetroHealth"),  John Moss, Tamiyka Rose,  E. Harry Walker, M.D., Laura McBride,  Sonja Rajki, Sarah Partington, and Robin Barre (collectively, the "Defendants") as follows:

## PARTIES

1.      Plaintiff is a resident of Cuyahoga County, Ohio.

2.      Upon information and belief, MetroHealth is a hospital that operates and has its principal place of business in Cuyahoga County, Ohio.

3.      Upon information and belief, Defendant John Moss ("Defendant Moss"),  during all times relevant to the Complaint, was a member of the Board of Trustees of MetroHealth, and is a resident of Cuyahoga County, Ohio.

4.      Upon information and belief, Defendant Tamiyka Rose ("Defendant Rose"),  during all times relevant to the Complaint, was employed by the Board of Trustees of MetroHealth as its Board Liaison, and is either a resident of Cuyahoga County, Ohio or is employed in Cuyahoga County, Ohio by MetroHealth.

2

5.      Upon information and belief, Defendant E. Harry Walker ("Defendant Walker"), during all times relevant to the Complaint, was a member of the Board of Trustees of MetroHealth, and is a resident of Cuyahoga County, Ohio.

6.      Defendant Walker, Defendant Rose, and Defendant Moss are sometimes collectively referred to as the "Board Defendants" in this Complaint.

7.      Upon information and belief, Defendant Laura McBride. ("Defendant McBride"), served as co-General Counsel at MetroHealth,  and is a resident of Cuyahoga County, Ohio.

8.      Upon information and belief, Defendant Sonja Rajki ("Defendant Rajki"),  served as co-General Counsel at MetroHealth until May 2024,  and is a resident of Cuyahoga County, Ohio.

9.      Upon information and belief, Defendant Sarah Partington ("Defendant Partington") served as Director of Compliance Operations/Senior Compliance Officer at MetroHealth, and is a resident of Cuyahoga County, Ohio and/or was employed in Cuyahoga County, Ohio.

10.     Upon information and belief, Defendant Robin Barre ("Defendant Barre") served as Director of Compliance at MetroHealth, and is a resident of Cuyahoga County, Ohio and/or was employed in Cuyahoga County, Ohio.

### JURISDICTION

11.     Jurisdiction is proper because the subject conduct occurred in the Northern District of Ohio  and the Complaint alleges violations of federal laws.

12.     Upon information and belief, this Court's personal jurisdiction over each of the Defendants is proper because the Defendants were each employed in the Northern District of Ohio and/or reside in the Northern District of Ohio, and the conduct giving rise to Plaintiff's injury occurred in the Northern District of Ohio.

13.     Venue is proper here pursuant to 28 U.S.C. § 1391(b)(1) and (2).

3

## FACTS COMMON TO ALL COUNTS

### *Steed's Employment at MetroHealth*

14.     Plaintiff reincorporates all preceding Paragraphs of this Complaint as if restated herein.

15.     Upon information and belief, in early 2022, MetroHealth began a competitive nationwide search for a new CEO to replace its then current CEO, Dr. Akram Boutros.

16.     Steed was solicited for the replacement CEO position as part of this nationwide search process based on her extensive executive leadership experience and track record of high performance, most recently serving in a similar capacity at a health system in Chicago, Illinois and received a "Leadership Profile" from Witt Kieffer, an executive search company.

17.     Based on the representations made during the search process and the Leadership Profile, Steed was informed that MetroHealth was looking for a new CEO who would act as follows:

    a.  "Reporting directly to the Board of Trustees, the CEO will be responsible for advancing the mission of MetroHealth to be the most admired public health system in the nation, renowned for innovation, outcomes, service, and financial strength. In partnership with the Board of Trustees, the CEO will develop and implement MetroHealth's strategic direction and vision to grow and strengthen the health system's impact in the community" (*Id.*, numbered page 1);

    b.  "The CEO will seek opportunities to integrate the health system into the community further and reinforce the health system's role across the region" (*Id.*);

    c.  "The CEO will serve as the face and voice of MetroHealth building relationships and cultivating partnerships throughout the community to advance the mission of the

health system and champion MetroHealth's commitment to a healthier community" (*Id*.);

    d.   Encourage the integration of the system with the communities it serves through effective communication, active involvement, and positive public relations initiatives. Represent MetroHealth on state-wide boards, associations, and committees. Assure community awareness of the organization's responsiveness to community needs" (*Id*., numbered page 8);

    e.   "Ensure compliance with all regulatory agencies governing healthcare delivery and financing and the standards of accrediting bodies by continually monitoring the operation of their programs and initiating changes where appropriate to manage market and fiscal forces at the state, regional and federal levels" (*Id*.);

    f.   "Create and support an environment that encourages and fosters diversity, equity, and inclusion, as well as innovation and creativity" (*Id*.);

    g.   "Connect the organization to the broader healthcare community nationally. The CEO will be a conduit to ensuring that MetroHealth is well-known in the healthcare community and that it is proactive in adopting appropriate, contemporary solutions to benefit its patients, employees and community" (*Id*., numbered page 9).

18.    On or about September 21, 2022, Steed signed an Employment Agreement and 457f Agreement (collectively herein, the "Employment Agreement") with MetroHealth to serve as President and Chief Executive Officer ("CEO") of MetroHealth effective January 1, 2023. A true and accurate copy of the Employment Agreement, its Amendment, and subsequently signed a 457 f Agreement are not attached hereto, as Defendants have a copy pursuant to Civ.R. 10(D), but can be furnished to this Court at a later date.

19.     On or about September of 2022, MetroHealth announced that Steed would serve as MetroHealth's CEO effective January 1, 2023.

20.     The Board publicly shared its belief that Steed was qualified for the position. MetroHealth Board Chair Vanessa Whiting stated:  "Dr. Steed's capabilities, character and experience are a perfect match for the qualities we wanted in our next CEO". . . "She comes from a major safety-net healthcare system that shares a similar focus to that of MetroHealth: improving the health of the community in an urban, academic setting.  Airica has been successful in improving quality of care, patient satisfaction, operating results, and health equity.  She also has a deep history as an innovator and as a community collaborator who builds strong relationships among partners, both of which will continue to be important to our success." "We were fortunate to have several excellent candidates for the CEO role," continued Whiting. "The Board was unanimous in the belief that Dr. Steed was the right leader to take MetroHealth forward, particularly as we open The Glick Center, our new hospital, and to increase our impact on our community's health."

21.     Shortly thereafter, in late October or early November 2022, MetroHealth's Board of Directors ("Board"), through Vanessa Whiting, former Board Chair, asked Steed to begin her role as CEO of MetroHealth earlier on December 5, 2022, and Steed agreed.

22.     Upon information and belief, Steed began her job duties one month early due to circumstances involving its prior CEO, Dr. Akram Boutros, being forced out of his employment from MetroHealth earlier than his planned retirement at the end of December 2022.

23.     Steed was MetroHealth's first African American CEO, first female CEO, and first nurse CEO in its nearly 200 year history.

24.     Immediately upon commencing her job as CEO of MetroHealth, Steed began to experience discrimination, harassment, unfounded accusations, and a toxic work environment from many of the Defendants in this action, as well as other employees of MetroHealth, including Defendant McBride, Defendant Rajki, Defendant Rose, Defendant Partington, Defendant Barre, Defendant Walker, Defendant Moss, and other employees, executives, and officers at MetroHealth. MetroHealth subjected Steed to a heightened degree of scrutiny, oversight and control that no MetroHealth CEO outside her protected class had faced previously at no fault of Steed's.

25.     Several MetroHealth Board members and MetroHealth's co-General Counsels at the time, Defendant McBride and Defendant Rajki, sought to undermine Steed on a consistent basis and her authority as CEO was constantly challenged and interfered with. Defendant McBride and Defendant Rajki consistently acted with malice and calculation to create division between Steed, the Board and its Chair.

26.     Dr. Walker enabled and encouraged this hostile work environment.

27.     As a result of this conduct, Steed encountered discriminatory, harassing, and hostile discrimination and retaliation from colleagues at MetroHealth.

28.     Shortly after Steed began to work as CEO of MetroHealth, Defendant Rajki told Steed that she was "guilty until proven innocent."

29.     Upon information and belief, a criminal investigation into Dr. Boutros's conduct at MetroHealth began in approximately January of 2023, which was initiated by Chris Ronayne, Cuyahoga County Executive, and Cuyahoga County Councilman Pernel Jones, and which was conducted by the Ohio State Auditor and Ethics Commission.  This investigation also called for oversight of the MetroHealth Board of Trustees.

30.     Shortly after Steed began as CEO, Defendant McBride, Defendant Rajki, Defendant Partington, and Defendant Barre brought several unfounded accusations about Steed to the Board behind Steed's back, including false, frivolous and defamatory accusations. These allegations included claims about allegedly using private drivers and planes improperly, improper hiring practices, having multiple DUIs and excessive drinking which were false, frivolous and defamatory, among others.

31.     Upon information and belief, the legal and compliance teams, including Defendant McBride, Defendant Rajki, Defendant Partington, and Defendant Barre did not conduct any due diligence to determine if the allegations had merit, including reviewing objective evidence to refute allegations, nor did they engage Human Resources or Steed directly.

32.     Had Defendant McBride, Defendant Rajki, Defendant Partington, or Defendant Barre simply investigated the truth of these accusations rather than repeating them to others including the Board, they would have learned that they were false.

33.      Upon information and belief, no MetroHealth executive, Legal, Compliance or HR employee sought to learn the truth (or, in this case, lack thereof) behind those unfounded accusations from Steed herself, and no Board member, or Defendant McBride, Defendant Rajki,  Defendant Rose, Defendant Partington, or Defendant Barre was subject to any consequence for making such false, reckless, and defamatory accusations.

34.     Upon information and belief, several other frivolous complaints, some of which were anonymous, regarding Steed were allegedly "submitted" by Defendant Partington or Defendant Barre in MetroHealth's Compliance Department to Defendant McBride and Defendant Rajki, who did not take any steps to investigate their truth prior to submitting them to the Board behind Steed's back. Subsequent investigation, conducted only after Defendant McBride and Defendant Rajki submitted them to the Board, demonstrated that these allegations had no merit.

35.     On or about July of 2023, Dalph Watson was hired by Steed to serve as the Chief People & Administrative Officer.  Ms. Watson was responsible for overseeing all Human Resources functions for MetroHealth. Almost immediately, Steed began escalating her concerns to Ms. Watson both verbally and in writing regarding the toxic and hostile workplace, harassment and discrimination that she was being subjected to, including by Defendant McBride, Defendant Rajki, Defendant Partington, and Defendant Barre from the compliance department.

36.     Upon information and belief, Ms. Watson attempted to address Steed's concerns with Defendant Walker; however, the concerns were disregarded.

37.     On or about January of 2024, the Board hired Defendant Rose as Board Liaison. Defendant Rose was hired to serve as a bridge between administration and the Board, create standard processes and facilitate stronger relationships.  Despite this job assignment, Defendant Rose did nothing to prevent or stop this incessant harassment of Steed, toxic work environment or discrimination against Steed based on being the first African American CEO at MetroHealth. Instead, Defendant Rose perpetuated and aided the wrongful conduct and toxic work environment, including soliciting frivolous complaints among MetroHealth employees, distributing Board members' contact information to MetroHealth employees to provide comments about Steed, and spearheading a smear campaign against Steed, which was reflected in several complaints submitted to the MetroHealth Ethics Line "MEL" and was witnessed by many MetroHealth employees.  Defendant Rose was weaponized to create disruption, interference, and division between Steed and the Board.

38.     Upon information and belief, further seeking to sow distrust between the Board and Steed, Defendant McBride and/or Defendant Rajki retained outside counsel on behalf of MetroHealth to investigate Steed, despite their positions as employees who were to report directly to Steed.  Dalph

Watson, Chief People Officer, aware that this was an  improper practice, received an opinion from Zashin & Rich, outside counsel, regarding proper practice of reporting concerns and investigating the CEO.

39.     Upon information and belief, without Steed's involvement or permission and without any involvement or permission from Ms. Watson,, Defendant McBride created a policy for investigating the CEO in or about April of 2024.

40.     Steed complied with her obligations as CEO of MetroHealth and acted in accordance with her job duties as described to her.

41.     In Steed's first year as CEO, MetroHealth's net revenue increased  from $1.6 billion to nearly $2 billion, MetroHealth launched a multifaceted $150 million financial improvement plan, improved quality outcomes and reduced patient harms by 40%, implemented and expanded programs and services throughout the county, forged new strategic partnerships and relationships, pivoted and re-imagined the campus transformation efforts and became a national and international voice for health equity, among other things. Steed was a demonstrated visible and accessible leader, conducting over 100 listening sessions throughout MetroHealth and the surrounding communities, launching Leadership Listening Rounds, and Ask the CEO sessions.

42.     In addition, in light of the circumstances surrounding Steed's predecessor's departure from MetroHealth, Steed immediately began to restore trust across MetroHealth and the communities at large, including the Cuyahoga County Council which raised the HHS levy subsidy for MetroHealth for the first time in more than 6 years.

43.     In the first few months after starting as CEO, Steed suspended the subsequently eliminated supplemental bonus program that was at the center of the recent MetroHealth controversy.

44.     Steed earned several prestigious distinctions and accolades during her tenure as CEO, which brought significant brand recognition to MetroHealth, including being recognized as one of the

most influential leaders in healthcare and one of the top women leaders by Modern Healthcare, with the top women leaders recognition being awarded in July 2024, less than a month from her unlawful termination. Steed earned a Board seat with the Ohio Hospital Association for the first time in MetroHealth's history of over 25 years.

45.     Former Board Chair Vanessa Whiting was quoted saying "This recognition from Modern Healthcare is a testament to the visionary leadership Dr. Steed has demonstrated since her arrival in Cleveland and throughout her career". "MetroHealth and the Cleveland community are fortunate to have such an engaged and compassionate leader who is committed to operational excellence and tearing down the systemic barriers that prevent far too many of our neighbors from living their healthiest lives." Following Steed's recognition as Modern Healthcare's 100 Most Influential Leaders in Healthcare, Defendant Walker, then Chair of the MetroHealth Board was quoted as saying: "MetroHealth is fortunate to have a leader that understands our mission and is deeply committed to not only acknowledging health disparities but eradicating them," Defendant Walker said.

46.     Despite this, the Board did little to nothing to protect Steed from discrimination, harassment and a toxic work environment, and several Board members joined in other Defendants' efforts to unfairly discredit and undermine Steed and discriminate against her and took the frivolous complaints escalated above her head at face value, which is outlined in her self-assessment in her annual performance review, emails, text messages, and documents of public record.

47.     Nonetheless, when MetroHealth performed a 360 review on Steed in March of 2024, Steed exceeded the stated goals for every measure of her review and was paid out 121% of her performance bonus as a result of that review. The Board described her performance as commendable despite the unprecedented challenges that she had to navigate in her first and only year.

11

48.     Steed challenged the 360 review as being biased and unfair yet still received a positive review, even with biased, discriminatory, and unfair feedback included therein.  It is also important to note that based on information and belief, Steed's predecessors not in her protected class were not subjected to a 360 review within their first year as CEO, especially under such unfavorable circumstances.

49.     Further, in contrast to the authority granted to Steed's predecessors outside of her protected class, the Board actively attempted to prevent Steed from building her own leadership team, including hiring a Chief Legal Officer of her choice, which is a decision firmly within her authority.

50.     During the hiring process, a selected candidate accepted then rescinded his acceptance of the offer due to his concerns with MetroHealth Governance, specifically quoted in an email written on June 20, 2024 saying "After discussing the opportunity with my family tonight I have decided I will not be signing the offer letter to work at MetroHealth.  The delay in my meeting offered me time to work through a lingering concern I had about MetroHealth governance. While Dr. Steed and I had similar ideas about the functions and reporting of the CLO in practice, it was clear to me that the Board of Directors have a different notion than the executives.  The result would be, at best, that I would be in the immediate firing line between the CEO and the Board, and at worst in an immediate ethical crisis. The noise surrounding the prior CEO's departure and the related litigation can be overcome, but the Board's current overreaction and overreach in management prerogative cannot.  I feel this unfortunate tension spoils an otherwise wonderful opportunity and would prevent success."

51.     Steed raised and escalated her concerns regarding discrimination, harassment, and toxic work environment and governance concerns to several parties both verbally and in writing, including Vanessa Whiting, former Board Chair, Dr. Harry Walker, Board Chair, John Moss, Vice Chair, JB Silvers, former Board Member, John Hairston Jr, former Board Member, Sharon Dumas, Board Member, Nancy

Mendez, Board Member, Chris Ronayne, County Executive, Tamiyka Rose, Board Liaison, Dalph Watson, Chief People & Administrative Officer, Derrick Hollings, Chief Financial Officer, Chris Briddell, Chief Ethics, Risk, & Compliance Officer, Marlon Primes, Interim Chief Legal Officer, Darlene White, Associate General Counsel and former Interim Chief Legal Officer, Kim Russel, Board Governance Consultant, Stephen Zashin, Outside Counsel – Zashin & Rich, and Marisa Darden, Outside Counsel - Benesch. In addition to raising and escalating her concerns, Steed made multiple attempts to achieve an amicable resolution, including enlisting the assistance of Marisa Darden from Benesch.

52.     On or around July 16, 2024, Steed filed a formal complaint outlining the discrimination, harassment and toxic work environment, which was never formally investigated by the Board although acknowledged by Board Member Sharon Dumas.

53.     Upon information and belief, Steed's complaint was escalated to the Board by Mr. Primes on or about July 18, 2024.

### *Steed's Suspicion of Felonious Conduct at MetroHealth*

54.     Plaintiff reincorporates all preceding Paragraphs of this Complaint as if restated herein.

55.     Upon information and belief, a month after Dr. Boutros's abrupt departure from MetroHealth as its CEO in November 2022 and prior to his previously planned retirement date, Board Member Terry Monnolly abruptly resigned from the Board in December 2022.  Terry Monnolly also served as Chair of the Facilities and Space Committee of the Board which was responsible for the oversight of the campus transformation activities and bond financing, including the newly constructed Glick Center and Apex development.

56.     Upon information and belief, a few months after Dr. Boutros's abrupt departure from MetroHealth as its CEO in approximately November 2022 and prior to his previously planned retirement

date, MetroHealth's CFO Craig Richmond left his employment with MetroHealth on or about March 2023.

57.     Mr. Richmond's departure coincided with the release of an independent audit assessment conducted by the accounting firm BDO and the allegation that proper controls were not enforced pertaining to the payment of supplemental bonuses to the former CEO

58.     Mr. Richmond was succeeded by Derrick Hollings as MetroHealth's new CFO on or about September of 2023.

59.     On or about mid to late March of 2024, Steed learned from Mr. Hollings that, while he attempted to retrace the steps of the former CFO, Mr. Richmond, in determining MetroHealth's finance strategy for certain bond payments related to the campus transformation efforts and MetroHealth's Apex project financing as part of his fiduciary responsibility that also fell under the oversight of former Board Member and Chair of the Facilities & Space Committee Terry Monnolly who abruptly departed the Board following Dr. Boutros' termination, he discovered that:

   a.   Hundreds of millions of dollars were at risk;

   b.   Timing components of certain loans and sources of funding were never fully activated, including the Apex ambulatory development not being included in the bond for campus expansion and was pending final approval from the Board for completion;

   c.   Many years' worth of Mr. Richmond's e-mails in the MetroHealth computer system were conspicuously missing, despite MetroHealth's retention policy requiring their preservation;

   d.   Other MetroHealth executive leaders' emails and files associated with the ongoing criminal investigation were missing; and

   e.   The hard drive containing Mr. Richmond's records was missing.

60. The missing records were nothing short of a "surgical removal" of years of MetroHealth records, which are public records.

61. Because the missing records were former CFO records, Steed believed that some of those records would have related to approximately $1 billion in bond dollars. Those bonds were still active at the time that Steed raised her missing records concerns.

62. Steed learned of this "surgical removal" of the former CFO's public records after a criminal investigation into Dr. Boutros's conduct while acting as MetroHealth's CEO had begun.

63. Steed had reason to believe that this "surgical removal" amounted to a violation of several Ohio laws, including felonies, and may have also been done to cover up additional illegal and possibly felonious conduct, including potential fraud related to the construction financing, and obstruct and tamper with an ongoing criminal investigation. At this time, many accusations had been made pertaining to the former CEO – Dr. Akram Boutros, including concerns raised during the BDO assessment potentially involving Terry Monnolly, as well as the history of corruption and legal and ethical misconduct of former MetroHealth executives, including former executive Ed Hills who was found guilty of racketeering and other related crimes.

64. Steed verbally instructed Mr. Hollings to investigate the missing information and public records further with MetroHealth's Chief Information Officer David Fiser, who reported directly to Mr. Hollings to validate the concerns and to determine a justification for their absence. Mr. Fiser was instructed to prepare a PowerPoint summary detailing the missing emails and records to escalate to the Board.

65. Steed then learned through Mr. Hollings' investigation and by admission from David Fiser that Defendant McBride and Defendant Rajki, by text messages and/or email messages, had ordered one or several individuals from the MetroHealth IT department to delete these records and that

15

IT was acting based on the specific instructions from the legal department. Additionally, it was also learned through this preliminary investigation that the MetroHealth IT department was instructed by the legal department to delete records of other former executives in addition to Craig Richmond, former CFO.

66. Once again, Steed had reason to believe that numerous Ohio felonies were committed and/or covered up through this "surgical removal" and deletion of public records. Additionally, Steed had reason to believe that evidence pertaining to an ongoing criminal investigation was being tampered and interfered with by the legal team on the basis of the information shared by Derrick Hollings, CFO and the admissions made by David Fiser, CIO.

67. On or about March of 2024, Defendant Moss became Vice Chair of MetroHealth's Board and maintained his role as Chair of the Finance Committee of the Board, a role that he also had during Dr. Akram Boutros' tenure as CEO

68. Steed instructed Mr. Hollings verbally to inform Defendant Moss about his findings about the deletion of MetroHealth public records and her concerns about criminal misconduct given his role as Chair of Finance Committee and liaison with the CFO and Treasurer, one of the primary subjects of these concerns.

69. Upon information and belief, Mr. Hollings verbally reported these concerns to Defendant Moss on or around April 2024, who immediately dismissed the concerns and instructed him not to investigate further. As part of this communication, Mr. Hollings shared the alleged connection to the Boutros matter and the concerns regarding the potential involvement of the co-general counsels Defendant McBride and Defendant Rajki, including making reference to the Co-General Counsels benefitting from the supplemental bonus program that led to Boutros's termination. Defendant Moss

defended the co-general counsels and minimized their involvement and indicated that the Co-General Counsels turned down the supplemental bonus payments, which was not accurate.

70.    Upon information and belief, after Steed expressed her concerns about missing/ deleted records, on or about April of 2024, Ernst & Young ("E&Y") began to conduct an internal audit risk assessment for MetroHealth in which it was reported that there were concerns regarding deleted emails and missing public records related to the former CFO and other MetroHealth executives, which was a potential risk for criminal activity and potentially fraudulent activity.

71.    E&Y separately escalated this "missing information" and "deleted public records" concern to Steed on or about May of 2024. As part of this communication, E&Y indicated to Steed that they would be advising the Board that based on this concerning information revealed in the internal audit risk assessment, including the alleged deleted public records pertaining to the former CFO and other former executives, that they recommended a full forensic assessment be completed before they could move forward with the internal audit work.

72.    Upon information and belief, E&Y informed the Board of its preliminary findings during a Board meeting on or about late June 2024.

73.    Upon information and belief, E&Y informed the Board  both verbally and in writing in June 2024 that it could not do any further work on its internal audit risk assessment without a full forensic audit and review of all information related to the missing information.

74.    Steed requested that MetroHealth comply with E&Y's request, and the Board overruled this request, obstructing the internal audit and forensic computer record investigation. The Board elected not to approve a resolution to move forward with the forensic audit based on E&Y's recommendations despite the resolution being drafted for Board approval.

75.     Thereafter, E&Y formally resigned from the MetroHealth risk audit and any further internal audit work for MetroHealth based on concerns with the Board's failure to move forward with the forensic audit recommendations and conduct a completely independent review without Board interference.

76.     Around this time, in May of 2024, the Board began excluding Steed from Board meetings and began to discuss issues without Steed's involvement or participation, although members of the management team were included in Board meetings and discussions including Defendant McBride and Defendant Rose, with McBride being a direct report of Steed.

77.     At this point, Steed began to suspect Board involvement in the felonious and criminal misconduct.  This misconduct included  the co-General Counsels' discrimination and toxic work environment as well as the ethical/legal misconduct of MetroHealth and the Board through the actions of Defendant Walker.  In one instance, Defendant Walker undermined the terms of an executed separation agreement with Defendant McBride.  Defendant Walker instructed Steed that "no action should be taken with regard to Defendant McBride's employment or separation agreement."  Defendant Walker further told Steed that the Board wanted Defendant McBride to "continue working with the Board because her institutional knowledge and work on several matters affecting the System and the Board are important assets."

78.     The hostile work environment Steed faced continued during this time, through Defendant Walker, Defendant Rajki, Defendant McBride, Defendant Rose, and others at MetroHealth.

79.     Upon information and belief, thereafter, the Board retained outside counsel Tucker Ellis to investigate the Board's risks associated with the Board's approach to the allegations that had been brought forward.  Tucker Ellis was the same firm that had been retained to conduct an initial assessment regarding the Boutros compensation matter.

80.    Upon information and belief, E&Y raised concerns regarding whether Tucker Ellis was independent and whether Tucker Ellis could conduct an unbiased investigation of these misconduct allegations.

81.    Subsequent to the E&Y internal audit risk assessment preliminary findings and recommendations, on or about late June 2024, an anonymous written complaint was reported to the MetroHealth Ethics Line "MEL" reporting the concerns regarding the missing/deleted emails and public records which was allegedly instructed to be deleted by the legal department.

82.    On or about July 1 of 2024, Marlon Primes was hired by Steed to serve as Interim Chief Legal Officer after the internal incumbent and African American female Darlene White abruptly stepped down from the Interim Chief Legal Officer role after being subjected to scrutiny and pushback from her peers, including what was reported as Defendant Rose adversely influencing her, which was also reported as a complaint in the MetroHealth Ethics Line in the Compliance Department.

83.    Subsequent to Marlon Primes' arrival at MetroHealth, several anonymous complaints were submitted to the MetroHealth Ethics Line containing allegations that MetroHealth employees and/or executives used the racial epithets of "colored" and "n[*****]s" in response to the appointment of Marlon Primes hiring and the continued hiring of African American leaders at MetroHealth.

84.    Steed began escalating concerns, both verbally and in writing, including the missing/deleted emails, the undermining, the toxic work environment and harassment, and the racism/discrimination she encountered at MetroHealth.

85.    After verbally reporting her concerns on numerous occasions to several parties, on or about late June and early July of 2024, Steed informed Maureen Dee, a member of MetroHealth's Board and Chair of Audit & Compliance Committee, both verbally and in writing that she was concerned about the missing and deleted public records and racial discrimination that she observed at MetroHealth,

thereby reporting her concern about felonious and criminal conduct that had occurred at MetroHealth. Steed recommended to Maureen Dee that this be brought forward as part of the Audit & Compliance Committee.

86.    On or about July 5, 2024, after several failed attempts to proceed with forensic investigation recommended by E&Y and as a direct response to the reported compliance concerns, Steed in conjunction with Chris Briddell, newly appointed Chief Ethics, Risk and Compliance Officer and Marlon Primes, interim Chief Legal Officer of MetroHealth at the time, retained Benesch on behalf of MetroHealth to conduct a comprehensive independent review of the missing and deleted public records, hard drives, and emails and to conduct a forensic investigation to substantiate or rule out the concerns. Benesch Law was retained as outside counsel to investigate the complaints of potential ethical, legal, and/or criminal misconduct, which involved several members of the legal and IT departments at MetroHealth.

87.    Steed further expanded Benesch's engagement to investigate racial discrimination against her and others at MetroHealth as a result of several anonymous complaints that were escalated to the MetroHealth Ethics Line "MEL"

88.    Benesch began its engagement on or about July 8, 2024.

89.    Upon information and belief, in conjunction with this investigation, on July 12, 2024, Mr. Primes met with Defendant Walker and Defendant Moss to discuss Steed's concerns and the rationale for bringing in outside counsel Benesch to conduct an independent investigation due to the conflicts of interest related to the involvement of the legal department, including the deleted emails and potential felonious conduct, smear campaign against Steed, governance malfunction issues, as well as concerns regarding racism and discrimination and Defendant Walker and Defendant Moss disregarded the concerns once again. Specifically, Defendant Moss dismissed any concerns regarding racism given

Defendant Walker and Defendant Rose are African American like Steed and even accused Mr. Primes of being the author of the complaints although several complaints were submitted before Mr. Primes was hired as Interim Chief Legal Officer on July 1, 2024.

90.     Upon information and belief,    Mr. Primes also shared copies of    all allegations/complaints, including deleted emails and rescinded acceptance of offer from Chief Legal Officer candidate with Defendant Moss and Defendant Walker and reiterated through a follow up email sent to Defendant Walker on July 12, 2024 that "no one will be retaliated against for filing the anonymous complaints and that the complaints will be taken seriously and properly investigated." Subsequently, Mr. Primes also shared the same communication, including allegations and complaints with Outside Counsel, Adrian Thompson on July 16, 2024.

91.     Upon information and belief, on or around July 18, 2024 Benesch interviewed Defendant McBride as part of its investigation and confiscated her computer for forensic analysis.

92.     Upon information and belief, after Benesch interviewed Defendant McBride, the Board interfered with the Benesch investigation through the actions of Defendant Moss, preventing Benesch from completing its analysis of Defendant McBride's conduct and computer, the missing emails and public records, or Steed's racial discrimination concerns.

93.     At this time, Steed had both verbally and in writing reported her concerns to numerous MetroHealth Board members, Executives, Chief People & Administrative Officer – Dalph Watson, Interim Chief Legal Counsel – Marlon Primes, Chief Ethics, Risk & Compliance Officer – Chris Briddell, Chief Financial Officer – Derrick Hollings and MetroHealth's outside counsel at Benesch that certain MetroHealth employees had undermined, racially discriminated against and harassed her, as well as created a toxic work environment and her reasonable suspicion that certain MetroHealth employees

21

could have committed felonies associated with funding, missing public records, and/or tampering with or concealing evidence of previously committed crimes.

94.     Upon information and belief, Defendant Moss specifically instructed Benesch to shut down its investigation of Defendant McBride via email and then subsequently minimized and altered the scope of the investigation, once again interfering with and attempting to obscure an investigation into Steed's beliefs that various crimes had been committed at MetroHealth.

95.     On or about July 16, 2024, Steed submitted a formal written complaint about a toxic work environment at MetroHealth, which she submitted to Human Resources, Dalph Watson, MetroHealth's Chief People Officer, and Mr. Primes, MetroHealth's Interim Chief Legal Officer and was escalated to the Board per MetroHealth policy.

96.     Steed also submitted informal written complaints to MetroHealth's outside counsel, Stephen Zashin – Zashin & Rich and Marisa Darden – Benesch and escalated her concerns further to several elected officials, including Cuyahoga County Council members.

97.     Upon information and belief, around this time, MetroHealth had also received many anonymous written complaints about its toxic and discriminatory workplace, including racial harassment and discrimination.

98.     Upon information and belief, Benesch emailed Chris Briddell and Mr. Primes and resigned from this investigation the weekend of July 19, 2024, once again due to this Board interference.

99.     Upon information and belief, on July 19, 2024, Sharon Dumas, a member of the Board, acknowledged receipt of Steed's written complaint of racial discrimination and harassment in the workplace and toxic work environment, however no steps were taken by the Board to investigate Steed's concerns. Sharon Dumas also sent Steed a text message on July 2, 2024 after Steed brought several

concerns to her attention and seeking her helpful advice and words of wisdom indicating to Steed "I'll be available and will do the best I can".

***Steed's FMLA Leave and MetroHealth's Continued Discrimination and Retaliation***

100.    Plaintiff reincorporates all preceding Paragraphs of this Complaint as if fully restated herein.

101.    On or about July 19, 2024, as a result of the continued harassment, discrimination, and toxic work environment that she was subjected to, Steed sought medical care for a serious medical condition.

102.    Thereafter, Steed submitted information regarding her medical issues to MetroHealth and began MetroHealth approved continuous FMLA leave from July 22, 2024 through September 2, 2024 as a result of her serious medical condition.

103.    MetroHealth approved this FMLA leave and sent Steed a letter wishing her well and a speedy recovery and issued a press release announcing the approved FMLA leave on July 23, 2024. In the Press Release published on July 25, 2024, less than 3 weeks prior to Steed's unlawful termination, Defendant Walker was quoted as saying, "We wish her and her family well and look forward to her return." It is also important to highlight that during this same timeframe in mid to late July 2024, the Board called several special committee meetings to review ethics complaint investigations that took place in Executive Session.

104.    Shortly thereafter although the FMLA leave was anticipated for a short period, the Board elected to appoint an Acting Chief Executive Officer – Dr. Christine Alexander Rager, a Caucasian female, and removed Derrick Hollings, CFO, an African American male.

105.    Upon information and belief, while Steed was on FMLA leave, Mr. Primes engaged the State's Ethics Counsel to prepare an Ethics Opinion on the propriety of the Board's conduct described in this Complaint.

106.    Upon information and belief, Dalph Watson, MetroHealth's Chief People & Administrative Officer, and Christopher Briddell, MetroHealth's Chief Ethics, Risk & Compliance Officer, obtained a second opinion on the propriety of the Board's conduct described in this Complaint.

107.    Steed, through her former legal counsel Allen Boseman, served a Public Records Request on MetroHealth through its outside legal counsel in September of 2024 seeking these Opinions among other documents relevant to this dispute, but Steed has not received a single record in response to this Public Records Request and instead has received only objections from MetroHealth.

108.    MetroHealth is obligated to fulfill public records requests under Ohio law.

109.    Upon information and belief, on August 8 and/or August 9, 2024, through correspondence drafted by Ms. Watson at the Board's instruction, the Board attempted to courier letters to Steed's residence threatening to not reinstate her employment on the basis that MetroHealth was exercising the "key employee"/"highly compensated employee" exception to FMLA protections. During this same time, Mr. Primes sent a communication to the Board indicating that their actions of interfering with Steed's FMLA were unlawful and unethical and that proper notice was not given at the time FMLA was approved.

110.    Steed never received any letter from MetroHealth at any time indicating that her employment was at risk pursuant to any key employee/highly compensated employee exception.

111.    Steed never received any documents in response to her former attorney's public records request to MetroHealth and therefore does not have a copy of the alleged correspondence or any other documents and records described therein.

112.    On August 9, 2024, after engaging in protected activity including submitting a formal complaint, Steed was unceremoniously and publicly terminated while on approved FMLA, which she initially learned through the media, not through a discussion with any Board member. Shortly thereafter, Steed received a letter from Defendant Walker on behalf of MetroHealth indicating that MetroHealth "voted to terminate your employment Agreement" and that such termination was "without cause."

113.    This letter did not mention FMLA laws or the key employee/ highly compensated employee exception to FMLA laws.

114.    This abrupt change in the reason for terminating Steed's employment shortly after she began FMLA leave demonstrates that MetroHealth terminated Steed's employment as unlawful retaliation for taking FMLA leave, among other potential unlawful bases for such termination, and her FMLA rights were unlawfully interfered with by MetroHealth.  Additionally, Steed was replaced while on FMLA leave with a Caucasian female, an individual not in Steed's protected class as an African American and without being subjected to the same competitive search requirements.

115.    The decision to terminate Steed's employment shortly after she both verbally and in writing reported her reasonable suspicion of ethical, legal and potentially criminal misconduct that one or several MetroHealth employees or former employees had committed felonies when destroying public records, which may also have evidenced felonious and criminal conduct demonstrates that MetroHealth violated Ohio's Whistleblower Protection Statute, among other potential unlawful bases for such termination.

116.    Shortly after her unlawful termination, Steed reported the concerns that she had previously reported to MetroHealth Executives, Officers, and Board members verbally and in writing to the Ohio Attorney General, Ethics Commission, and Auditor of the State.  Steed also reported the violation of her federal FMLA rights to the US Department of Labor.

117.    Steed also reported her concerns before her termination to several key Cuyahoga County elected officials as well as MetroHealth's outside legal counsel, Attorney Marcia Fudge.  Mr. Primes also shared the written complaints, including Steed's formal complaint and the ethical and legal misconduct concerns with Attorney Adrian Thompson prior to Steed's unlawful termination while she was on approved FMLA.

118.    Upon information and belief, no MetroHealth Board member, no Cuyahoga County elected official nor Attorney Fudge nor Attorney Adrian Thompson took any steps to protect Steed's rights as MetroHealth's CEO, a minority member of a protected class, FMLA rights, or as a whistleblower.

119.    After receiving written reports of such racial discrimination and hostile work environment from Steed herself, the Defendants did not stop such conduct.

120.    One anonymous written complaint stated that the Defendants "are racists and don't want or like black people taking over the hospital" and that the MetroHealth leaders have "secret backdoor meetings working against the new leaders because they are Black."

121.    The Defendants also received notice of such discrimination through anonymous complaints submitted by individuals other than Steed.

122.    Steed demonstrated strong and high-level performance as MetroHealth's CEO, received a high ranking in her 360 employment review, received national awards and accolades and positive attention to MetroHealth and was nonetheless subjected to continued mistreatment.

123.    Steed was qualified for her position and was offered the position as CEO after a competitive nationwide search for the role.

124.    Further, the Defendants discriminated against Steed when conducting her 360 Review.

26

125.   The Defendants prevented the majority of Steed's direct hires from participating in her 360 Review, seeking to preclude positive feedback from being included in her review.

126.   The Defendants likewise challenged and undermined Steed's authority as CEO of MetroHealth.

127.   Upon information and belief, the Defendants rejected Steed as an African American leader and discriminated against her as a result of her status as a minority.

128.   When Steed spearheaded a separation agreement with Defendant Rajki and Defendant McBride due to their inappropriate conduct at MetroHealth, Defendant Walker informed Steed that no action would be taken with respect to Defendant McBride's separation agreement and that the Board intended to keep Defendant McBride as an employee working with the MetroHealth Board, despite her well-documented discrimination against Steed.

129.   As a result, Steed submitted a written complaint of this  discrimination on July 16, 2024, which was never investigated and was certainly never stopped by the Board

130.   As an African American, Steed is a member of a protected class.

131.   As detailed above, Steed endured discriminatory conduct from Defendants, among other employees, officers, and executives at MetroHealth.

132.   Defendants had actual knowledge of such conduct and participated in it, acting with actual malice.

133.   Defendants' conduct violates Ohio Revised Code 4112, which prohibits unlawful discriminatory practices. Defendants' conduct also violates the Civil Rights Act of  1964, 42 U.S.C. 2000e.

134.    Steed filed a Charge with the Ohio Civil Rights Commission and EEOC for the discriminatory conduct and hostile work environment on October 30, 2024, Charge No. 22A-2025-00605/ OCRC Case No. CLEB4(010743).

135.    Steed requested a Notice of Right to Sue.

136.    The Ohio Civil Rights Commission ("OCRC") issued Letters of Determination on March 6, 2025,  wherein the OCRC issued Steed's requested Notice of Right to Sue.  True and accurate copies of the Notices of Right to Sue issued by the OCRC are attached hereto as Exhibit A and incorporated herein by reference.

137.    The EEOC issued Steed's requested Notice of Right to Sue on March 24, 2025.  A true and accurate copy of that Notice of Right to Sue is attached hereto as Exhibit B and incorporated herein by reference.

138.    In response to Steed's EEOC Charge, MetroHealth submitted a Position Statement, which seems to indicate that MetroHealth accessed Steed's health records without Steed's permission.  A copy of the EEOC Position Statement is not attached hereto as an exhibit because Steed does not waive any rights related to her confidentiality; however, Defendants have a copy of that Position Statement, and a copy can be furnished to the Court under seal upon request.

139.    In conjunction with Steed's unlawful termination, on the same day on August 9, 2024, Marlon Primes – Interim Chief Legal Officer and African American male was also unceremoniously terminated and escorted out of the building by MetroHealth Police.  Subsequently, several other high ranking executives and members of a protected class were also terminated without justifiable cause and in line with this discriminatory and racial misconduct, including Dalph Watson –  Chief People & Administrative Officer, an African American female, who was replaced with Caucasian female Deb Southerington, Olusegun Ishmael – Chief Operating Officer, a Nigerian American male, who was

replaced by Caucasian male – Robert Bruce, and Adam Winston – Vice President, Local Government, an African American male, who was replaced by Caucasian female, Allison Poulios. The pattern of racism and discriminatory conduct has been pervasive since Steed's unlawful termination with members not in a protected class being set up for promotions and ideal working conditions, while members of a protected class have been demoted or terminated.

140. Pursuant to Section 7(B) of Steed's Employment Agreement with MetroHealth, MetroHealth agreed "it will not engage in any conduct or communications that are disparaging of [Steed]".

141. Nonetheless, MetroHealth, through many of its Officers, Board Members, and former Co-General Counsels did in fact engage in conduct and communications that wrongfully disparaged Steed.

142. Following Steed's termination "not for cause", MetroHealth, through Defendant Walker, issued a defamatory public statement indicating that Steed's termination was in fact "for cause", stating:

> It has become clear that the Board and Steed fundamentally disagree about the priorities and performance standards needed from our CEO for MetroHealth to fulfill its mission
>
> . . .
>
> [w]e believe Steed's performance is not meeting the needs of MetroHealth. As a result, we have lost confidence in her ability to lead the organization going forward and believe it would not be in the best interest of the System for her to continue in her position. Therefore, we are exercising our right to terminate her at-will contract. . . .
>
> We had high expectations when she arrived in 2022 and are sorry those expectations have not been met[.]

143. Importantly, on October 16, 2024, the Ohio Department of Job and Family Services Office of Employment Insurance Operations issued a Determination of Benefit Payment Eligibility, stating as follows:

29

> This Agency finds that the claimant was discharged without just cause . . .
> The facts provided did not support the claimant was discharged by
> METROHEALTH SYSTEM on 07/18/2024 for not being able to perform
> the required work.

144.    This finding is consistent with MetroHealth's own press release dated June 25, 2024,

which applauded Steed's performance as follows:

> Under her leadership, the safety-net hospital system has grown into an $2 billion
> organization with five acute and specialty-care hospitals, more than 9,000
> employees and over 40 ambulatory care locations. She has transformed
> MetroHealth with a People-First Culture that incorporates intentional listening,
> collaboration and empowerment to best serve caregivers, patients and the
> community.

145.    On or about March 27, 2024, Cleveland.com reported that:

> MetroHealth System exceeded its systemwide goals for 2023, which means CEO
> Airica Steed and other hospital leaders will receive their full salaries.
>
> Steed was able to earn her entire salary, the hospital system said. That includes the
> $900,000 guaranteed portion and a performance-based variable compensation
> award for 2023 of $381,156, the board of directors voted on Wednesday.

146.    Upon information and belief, MetroHealth, its Board, and the Defendants named in this

action who served as Board members sought to discredit Steed and damage her reputation publicly in

bad faith.

147.    Defendant Walker and the Board continued with their attempts to wrongly assassinate

Steed's character, and Defendant Walker issued a second statement doubling down on this position to

SignalCleveland, stating:

> This was purely an issue of the CEO's failure to perform and entirely based on her
> direct interactions with the Board of Trustees. . . The performance issues that caused
> us to act are long-standing and were made clear to her on numerous occasions. She
> failed for months to address them. Because of that, we lost confidence in her ability
> to lead the System and felt we had no choice but to end her at-will employment
> agreement.

148.    These press releases were false and defamatory.  In fact, the Board never had any meetings or conversations with Dr. Steed about any alleged performance issues. Steed met one on one with Defendant Walker and Defendant Moss, but those meetings were purely routinely-scheduled meetings between the CEO and Board Chair.  To add further context, four out of nine of the MetroHealth Board members were recently appointed and had minimal to no interactions or Board meetings with Steed.  In fact, Steed never met with the entire new Board that existed as of the date of her unlawful termination.

149.    Steed's last routine meeting with Defendant Walker and Defendant Moss occurred on July 19, 2024, during which time no concerns regarding Steed's performance were discussed.

150.    Less than one month later, Steed's Employment Agreement was terminated by Defendants and Steed was replaced by a Caucasian female

151.    Steed suffered numerous employment actions as a result of the discrimination, including a biased 360 Review, inability to hire her own team, and ultimately the termination of her Employment Agreement while on approved FMLA leave and was replaced by a Caucasian female  who was not subjected to the same competitive nationwide search

152.    Following her unlawful termination, Steed attempted to obtain the amounts owed to her by MetroHealth pursuant to the Employment Agreement.

153.    In pertinent part, Section 11(E) of the Employment Agreement provides that, should MetroHealth terminate the Employment Agreement without cause or "Without Good Reason", as was the case here, MetroHealth is required to pay Steed "her Base Salary for the shorter of: (i) sixty days; or (ii) the notice period provided by Executive with respect to Executive's termination."  Nothing in section 11(E) requires Steed to sign any waiver of rights in order to obtain said payment, which payment MetroHealth has failed and refused to pay Steed.

31

154.    Further, Section 12(B) of the Employment Agreement requires MetroHealth to pay Steed

a "Severance" as follows:

      1.    *Accrued Benefits*. The System shall pay to the Executive: (i) the Base Salary earned but not paid through the date of termination; (ii) any vacation time earned but not used through  the date of termination; and (iii) any PBVC earned but unpaid on the date of termination for a year ended prior to such termination and the unearned portion for the year of such termination prorated using the established target performance standard in effect for such periods, unless Executive worked nine (9) months or more, in which case the calculation will be made based on actual results. The period for which Executive receives severance will not constitute service time and will not render Executive eligible for PBVC.

      2.    *Continued Base Salary* & *Group Health Insurance Benefits.* The System shall continue to pay to Executive Base Salary for a period of twelve (12) months (the "Severance Period") after the effective date of termination. Further,  Executive may elect to continue coverage under COBRA, all Group Health Insurance Benefits that Executive has currently elected (medical, prescription drug, dental and vision) for the  Severance  Period. Executive will be responsible for normal employee contributions     to such     insurance     coverages     and     System   will pay Executive's COBRA premium through the Severance Period.  Thereafter, Executive may elect to continue such coverage under COBRA as applicable, at Executive's own expense.

      3.    *Extended Benefits.* Upon certification to MetroHealth by Executive of Executive's best efforts to secure employment, the System shall pay to Executive Base Salary for an additional period of twelve (12) months after the  Severance  Period  (the "Extended Severance Period"), except that during the Extended Severance Period, the amount of Base Salary paid by the System to Executive shall be reduced by any compensation  received by Executive from other employment or for services rendered. Therefore,  if/when  Executive  receives  compensation  during  the Extended Severance Period that is at or above the Base Salary payable by the System, the System's obligations to provide any benefits during the Extended Severance Period shall terminate thereafter.

155.    Following Steed's unlawful termination as CEO of MetroHealth, MetroHealth has failed

to make the required payments to Steed for severance and associated compensation, which has now been

delayed for nearly eight months and has caused significant financial hardship to Steed.  Additionally, as

of today, MetroHealth withheld a portion of payout of accrued vacation payments without justification,

which has now been delayed for nearly eight months. MetroHealth has also failed to pay Steed's COBRA premium, despite moving forward with an unlawful termination while Steed was on FMLA leave for a serious medical condition.

156.    In March of 2025, MetroHealth did make a payment to Steed, which MetroHealth's counsel claims was made pursuant to her 457(f) plan; however, without an itemization of that calculation, Steed does not yet know whether that payment was adequate. Steed reserves all rights and remedies regarding amounts owed under her 457(f) plan with MetroHealth and all other payment amounts owed pursuant to her various agreements with MetroHealth discussed herein.

157.    Instead, MetroHealth has refused to comply with its contractual obligations and has stated that it would only comply with its obligations if Steed signed an agreement waiving her right to bring suit against MetroHealth and requiring Steed to undertake other acts in MetroHealth's favor that are not a part of her Employment Agreement.

158.    The Employment Agreement provides that Steed's severance payments "shall be subject to Executive's execution of a general release and separation agreement, including standard terms (including mutual non-disparagement and no future employment provisions)" and does not require Steed to undertake the over eight pages of acts and agreements contained in the proposed Separation Agreement that MetroHealth has conditioned such payments on. *See* Employment Agreement, Section 12(C).

159.    MetroHealth's insistence on Steed's waiver of all claims against MetroHealth in addition to undertaking other acts such as cooperating with MetroHealth for any disputes MetroHealth has with others as a condition to obtain her severance payments is a violation of the Employment Agreement and MetroHealth's general duty to act in good faith and fair dealing.

160.    Steed complied with her obligations under the Employment Agreement, as evidenced by her termination "not for cause".

161.    Steed now files this action to cause the Defendants to comply with the Employment Agreement as well as applicable Ohio laws governing their conduct.

### COUNT I – Breach of Employment Agreement- Good Faith and Fair Dealing
### (As to Defendant MetroHealth)

162.    Plaintiff reincorporates all preceding Paragraphs of this Complaint as if fully restated herein.

163.    As described in the preceding Paragraphs of the Complaint, MetroHealth and the Board Defendants terminated Steed's Employment Agreement Without Cause.

164.    As a result, Steed is entitled to certain compensation, benefits and payments under the Employment Agreement and separate 457(f) Agreement if any remaining 457(f) payments are owed.

165.    Defendants have wrongfully withheld such payments from Steed and breached their obligation of good faith and fair dealing under Ohio law by requiring Steed to sign a Separation agreement and Release that contains terms beyond those detailed in the Employment Agreement with MetroHealth.

166.    Further, Defendant MetroHealth through Defendant Walker and the Board breached the Employment Agreement's non disparagement provision in the Agreement for the conduct described in the preceding Paragraphs, including the disparaging press release(s) and inaccurate information issued by MetroHealth, containing quotes from Dr. Walker that contradicts demonstrated evidence and accolades of high performance, and defamatory statements from Defendant Walker to the Foundation Board regarding Steed.

167.    Steed fulfilled her obligations under the Employment Agreement.

168.    Defendants lacked an overriding legitimate business justification for terminating Steed's employment.

169.    As a direct and proximate result of these breaches of the Employment Agreement, Steed has suffered significant financial hardship and has been damaged in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00), plus prejudgment and post-judgment interest at the statutory rate of interest.

## COUNT II – Whistleblower Retaliation in Violation of R.C. 4113.52
## (As to Defendant MetroHealth)

170.    Plaintiff reincorporates each and every preceding allegation as though fully restated herein.

171.    Upon learning that one or several MetroHealth employees engaged in fraudulent and criminal misconduct and intentionally deleted many MetroHealth emails, records, and even a hard drives belonging to MetroHealth's former CFO and other executives, Steed had reason to believe such deleted records contained evidence of felonious and criminal activity, or the deletion of the records constituted felonious activity under Ohio law, including tampering with evidence to cover up an ongoing criminal investigation.

172.    Steed reported her reasonable suspicion of felonious activity both orally and subsequently in writing to numerous MetroHealth Board members, Executives, and Officers and County elected officials.  Additionally, this was reported through formal Internal Audit activities, as well as to MetroHealth outside counsel.

173.    Steed also reported her belief that certain MetroHealth employees, officers, and/or Board members engaged in ethnic intimidation, which is a felony in Ohio, both orally and in writing to numerous MetroHealth Board members, Executives, and Officers.

174.     Steed made reasonable good faith efforts to determine the accuracy of her reports, and those efforts were thwarted by members of the Board, as described in this Complaint.

175.     Upon information and belief, MetroHealth failed to take the appropriate actions to correct the violations alleged herein.

176.     Upon information and belief, MetroHealth and the Board Defendants retaliated against Steed because she reported said unlawful conduct and discriminatorily subjected Steed to unfair scrutiny, harassment, toxic work environment and ultimately and unceremoniously removed her from her position as CEO and wrongfully and unlawfully terminated the Employment Agreement while on an approved FMLA leave.

177.     Defendants' conduct was deliberate, willful, and undertaken with actual malice and in bad faith.

178.     Defendants lacked an overriding legitimate business justification for terminating Steed's employment with MetroHealth.

179.     As a direct and proximate result of Defendants' conduct, Steed has endured significant emotional distress and financial hardship not to mention significant damage to her professional reputation and will continue to suffer economic and non-economic damages and financial hardship and Defendants are liable for reinstatement, back wages, emotional distress damages, restoration of benefits and rights, attorney's fees and costs, witness fees, expert fees, punitive damages, interest, and any additional legal or equitable relief that this Court deems appropriate in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

## COUNT III – FMLA Retaliation
### (As to Defendant MetroHealth)

180.    Plaintiff  reincorporates all preceding Paragraphs of this Complaint as if fully restated herein.

181.    On or about July 19, 2024, Steed sought medical care for a serious medical condition.

182.    Thereafter, Steed submitted information regarding her medical issues to MetroHealth and began MetroHealth approved FMLA leave from July 22, 2024 through September 22, 2024 as a result of her medical condition.

183.    MetroHealth approved this FMLA leave, sent Steed a communication wishing her well and a speedy recovery and issued a press release on July 23, 2024 announcing the approved FMLA leave with her expected return date.

184.    Upon information and belief, on August 8 and/or August 9, 2024, the Board attempted to courier letters to Steed's residence threatening to not reinstate her employment on the basis that MetroHealth was exercising the "key employee"/"highly compensated employee" exception to FMLA protections. During this same time, Marlon Primes – Interim Chief Legal Officer sent a communication to the Board indicating that their actions of interfering with Steed's FMLA was unlawful and unethical and that proper notice was not given at the time FMLA was approved.

185.    Steed never received any letter from MetroHealth at any time indicating that her termination was pursuant to any key employee/ highly compensated employee exception.

186.    Upon information and belief, MetroHealth's board shortly thereafter decided to terminate Steed's employment as CEO "without cause" instead of on the basis of the key employee/ highly compensated employee exception to FMLA laws.

187.    Upon information and belief, MetroHealth retaliated against Steed for taking FMLA leave by terminating the Employment Agreement, even while Steed remained on leave, with no basis for such termination.

188.    Upon information and belief, MetroHealth failed to properly comply with strict requirements to invoke the key employee/highly compensated employee exception to FMLA protections, as a termination notice must explicitly state that the exception is being invoked.

189.    Further, upon information and belief, even if MetroHealth somehow did invoke the FMLA exception, MetroHealth cannot prove that it would incur a substantial hardship as a result of Steed's continued employment during her FMLA leave.

190.    The lack of substantial hardship can be gleaned from the June 23, 2024 correspondence sent by Mr. Hollings to MetroHealth employees announcing Steed's FMLA leave, stating that: "This temporary situation [referring to Steed's FMLA leave] will not affect our mission or that important work in any way."

191.    Further, upon information and belief, MetroHealth replaced Steed during her approved FMLA with a Caucasian female who was not subjected to the same competitive nationwide search process.

192.    Defendants lacked an overriding legitimate business justification for terminating Steed's employment.

193.    As a direct and proximate result of Defendants' conduct, Steed has endured and will continue to suffer economic and non-economic damages not to mention significant damages to her professional reputation and Defendants are liable for reinstatement, back wages, restoration of benefits and rights, attorney's fees and costs, witness fees, expert fees, punitive damages, interest, and any

additional legal or equitable relief that this Court deems appropriate in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

## COUNT IV – Wrongful Discharge in Violation of Public Policy
### (As to Defendant MetroHealth)

194.    Plaintiff reincorporates all preceding Paragraphs of this Complaint as if fully restated herein.

195.    Defendants' conduct as described herein violated the clear public policy of Ohio as contained within the Ohio and United States Constitutions, state law, administrative rules and regulations, and Ohio common law, when Defendants subjected Steed to unfair and unwarranted discrimination, harassment, toxic work environment, terminated her employment, and otherwise retaliated against her because she reported and opposed unlawful conduct as described herein.

196.    Defendants intentionally, willfully, wantonly, recklessly, and maliciously violated the clear public policies manifested in Ohio and federal law, which required MetroHealth to take the following steps, which Defendants failed to take:

  a.  Ensuring that MetroHealth complied with all applicable laws related to public record retention as a public institution and record retention requirements under applicable laws related to bond financing;

  b.  Ensuring that MetroHealth complied with its own record retention policies;

  c.  Ensuring that MetroHealth did not interfere with any ongoing or future criminal, ethical and legal misconduct investigations;

  d.  Ensuring that MetroHealth did not discriminate or retaliate against any employee on the basis of race, gender, or any other protected class;

  e.  Ensuring that MetroHealth did not misappropriate funds;

      f.   Ensuring that MetroHealth did not tamper with or destroy any records related to an ongoing or future criminal investigation or evidencing any criminal conduct.

197.    Steed's termination was motivated by her reports, opposition to, and attempts to investigate the unlawful conduct set forth herein.

198.    Defendants lacked an overriding legitimate business justification for terminating Steed's employment.

199.    Steed's termination under the circumstances described herein jeopardizes public policies protecting the rights of individuals who report their reasonable suspicions of criminal activity, precisely as Steed did in this case.

200.    As a direct and proximate result of Defendants' unlawful conduct, Steed suffered and will continue to suffer economic and non-economic damages not to mention significant damage to her professional reputation for which Defendants are liable, including but not limited to non-economic relief including public retraction, pain and suffering and the loss of salary, wages, benefits, and other privileges and conditions of employment, and emotional distress.

201.    Defendants are liable to Steed for past and future economic and non-economic damages, including compensatory damages, pain and suffering, emotional distress damages, punitive damages, back pay, front pay, reinstatement with all previously existing rights and benefits, attorneys' fees and costs, witness fees, expert fees, interest and any additional legal or equitable relief that this Court deems just and appropriate, in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

## COUNT V – DEFAMATION
### (As to Defendant MetroHealth, Defendant Rose, Defendant McBride, Defendant Rajki, Defendant Partington,  Defendant Barre, Defendant Walker, and Defendant Moss )

202.    Plaintiff reincorporates all preceding Paragraphs of this Complaint as if fully restated herein.

203.    On August 9, 2024, Steed was unlawfully terminated "without cause" while on approved FMLA leave, which she learned of through the media and not any direct conversations with any Board members.

204.    Following the unlawful termination of Steed's  Employment Agreement, Defendants issued false statements in Press Releases disparaging Steed accusing her of performance issues, which was not only published locally but also nationally.

205.    These false and disparaging statements are in direct conflict with the actual facts about Steed's job performance, during which time she earned 121% of her performance-based compensation in April 2024 following a commendable performance review in March 2024. These false and disparaging statements are also factually inaccurate because the "for cause" reasons given to the media and public at large are inconsistent with the explicit representation communicated that the Board elected to terminate the Employment Agreement "without cause."

206.    Upon information and belief, the MetroHealth Board leaked Steed's travel expenses as CEO of MetroHealth to the press following the termination of her Employment Agreement.

207.    Steed's termination was not for cause and could therefore not have related to travel expenses.  Accordingly, any such statements to the press implying that Steed was terminated as a result of travel time or expenses is inaccurate and defamatory, attempting to unfairly cast blame on Steed for her termination which was in truth a termination without cause.

208.    Steed's travel expenses were properly submitted and approved by MetroHealth.

209.    Further, Steed's travel expenses were reasonable compared to the average CEO's travel expenses in the field.

210.    Upon information and belief, Defendant Rose harassed Steed and sought to investigate Steed's travel expenses, attempting to find fault with Steed's travel to no avail.

211.    These allegations include claims about alleged job performance, travel expenses and travel time, and insinuating that Steed's Employment Agreement was terminated for cause when it was in fact terminated without cause.

212.    Such publications were released to the public.

213.    Such publications were made with actual knowledge of their falsity.

214.    Examples of other defamatory statements made about Steed include, but are not limited to, Defendant Walker's statement on behalf of the Board indicating that Steed's Employment Agreement was terminated due to Steed's job performance, when the Board's termination notice stated that the termination was not for cause, and statements by Defendant Walker at internal MetroHealth Board meetings and Foundation Board meetings.

215.    The falsity of Defendant Walker's statement on behalf of the Board and MetroHealth itself was deemed false by the Determination issued by the Ohio Department of Job and Family Services Office of Employment Insurance Operations.

216.    As described above, Defendants Rajki, McBride, Partington, Barre, and Rose made defamatory statements about Steed during her employment at MetroHealth.

217.    Defendants Rajki, McBride, Partington, Barre, and Rose repeated false allegations such as claims that Steed used private drivers and planes improperly, improper hiring practices, having multiple DUIs and excessive drinking, all of which were false, frivolous and defamatory.

218.    Defendants Partington, Barre, Rose, Rajki, and McBride and others not only escalated such baseless complaints about Steed to the Board without investigating their truth, conducting any due diligence or engaging Human Resources, but they also gossiped and further spread the baseless complaints to several individuals within and outside of MetroHealth, causing individuals not involved in the investigation or reporting process to discuss such falsehoods about Steed.

219.    Upon information and belief, Defendant Rose solicited complaints against Steed from MetroHealth employees, including sharing the Board's contact information for employees to contact those Board members directly, and informed the MetroHealth Board of all negative information she allegedly "learned" about Steed without conducting any investigation into the truth of such allegations.

220.    Upon information and belief, Defendant Moss falsely informed other MetroHealth Board members that Steed was colluding with Boutros, which was a false statement.

221.    Upon information and belief, Defendant Moss and Defendant Rose spread false information about Steed's travel frequency and expenses to others at MetroHealth.

222.    These statements were all false and were made with actual knowledge or with reckless disregard for their truth or falsity.

223.    Such defamatory statements and the Board's decision to publicly claim a "for cause" reason for Steed's unlawful termination has caused significant and irreparable harm to Steed's reputation and career opportunities, causing Steed to incur actual damages.

224.    Such conduct has impacted every aspect of Steed's life and destroyed Steed's soaring career.  MetroHealth, through decisions authorized by its Board and Chair, torpedoed the spirt of the "without cause" termination by falsely manufacturing, marketing, and selling a narrative that Steed was terminated for performance reasons in a calculated effort to retaliate against Steed for engaging in protected conduct and further damage her part of the discriminatory and hostile work environment she encountered without just cause.

225.    As a result of such defamatory conduct, Defendants are liable to Steed for Compensatory and punitive damages, attorneys' fees and costs, witness fees, expert fees, interest and any additional legal or equitable relief that this Court deems just and appropriate, in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).  In addition to economic relief, Defendants are liable for non-economic relief, including emotional distress and pain and suffering damage, career damage, and a full public retraction of the defamatory statements.

### COUNT VI – FMLA INTERFERENCE
### (As to Defendant MetroHealth)

226.    Plaintiff reincorporates all preceding Paragraphs of this Complaint as if fully restated herein.

227.    On or about July 19, 2024, Steed sought medical care for a serious medical condition.

228.    Thereafter, Steed submitted information regarding her medical issues to MetroHealth and began MetroHealth approved FMLA leave from July 22, 2024 through September 22, 2024 as a result of her medical condition.

229.    MetroHealth approved this FMLA leave, sent Steed a communication wishing her well and a speedy recovery and issued a press release on July 23, 2024 announcing the approved FMLA leave with her expected return date.

230.    Upon information and belief, on August 8 and/or August 9, 2024, the Board attempted to courier letters to Steed's residence threatening to not reinstate her employment on the basis that MetroHealth was exercising the "key employee"/"highly compensated employee" exception to FMLA protections. During this same time, Marlon Primes – Interim Chief Legal Officer sent a communication to the Board indicating that their actions of interfering with Steed's FMLA was unlawful and unethical and that proper notice was not given at the time FMLA was approved.

231.    Steed never received any letter from MetroHealth at any time indicating that her termination was pursuant to any key employee/ highly compensated employee exception.

232.    Upon information and belief, MetroHealth's board shortly thereafter decided to terminate Steed's employment as CEO "without cause" instead of on the basis of the key employee/ highly compensated employee exception to FMLA laws.

233.    MetroHealth was covered by, and is governed by, FMLA laws.

234.    Upon information and belief, MetroHealth unlawfully prevented Steed for taking FMLA leave by terminating the Employment Agreement, even while Steed remained on leave, with no basis for such termination, thereby wrongfully depriving Sted of her right to take FMLA leave.

235.    Defendants lacked an overriding legitimate business justification for terminating Steed's employment and instead acted to prevent Steed from taking her lawful FMLA leave, interfere with such a right, and to retaliate against and discriminate against Steed in violation of numerous Ohio and federal laws.

236.    Defendants actually interfered with Steed's FMLA rights, terminating her employment before her previously-approved FMLA leave had concluded.

237.    As a direct and proximate result of Defendants' conduct, Steed has endured and will continue to suffer economic and non-economic damages not to mention significant damages to her professional reputation and Defendants are liable for reinstatement, back wages, restoration of benefits and rights, attorney's fees and costs, witness fees, expert fees, punitive damages, interest, and any additional legal or equitable relief that this Court deems appropriate in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

### COUNT VII – RACIAL DISCRIMINATION- R.C. 4112
### (As to Defendant MetroHealth)

238.    Plaintiff reincorporates all preceding Paragraphs of this Complaint as if fully restated herein.

239.    Shortly after beginning her role as CEO at MetroHealth, Steed encountered racial discrimination  from colleagues at MetroHealth.

240.    Defendant Rajki, Defendant McBride, Defendant Partington, and Defendant Barre brought unfounded accusations against Steed to the Board behind Steed's back, including false and defamatory accusations and discriminated against her and created a toxic work environment.

241.    Rather than put a stop to such discriminatory and harassing conduct, the Board Defendants, fully aware of such conduct, did not stop the conduct and instead took steps to retain the individuals involved the discriminatory conduct.

242.    Upon information and belief, such conduct persisted and worsened at the hands of the Board Defendants.

243.    After receiving written reports of such racial discrimination from Steed herself, the Defendants did not stop such conduct.

244. One anonymous written complaint stated that the Defendants "are racists and don't want or like black people taking over the hospital" and that the MetroHealth leaders have "secret backdoor meetings working against the new leaders because they are Black."

245. The Defendants also received notice of such discrimination through anonymous complaints submitted by individuals other than Steed.

246. Steed demonstrated strong and high-level performance as MetroHealth's CEO, received a high ranking in her 360 employment review, received national awards and accolades and positive attention to MetroHealth and was nonetheless subjected to continued mistreatment.

247. Steed was qualified for her position and was offered the position as CEO after a competitive nationwide search for the role.

248. Further, the Defendants discriminated against Steed when conducting her 360 Review.

249. The Defendants prevented the majority of Steed's direct hires from participating in her 360 Review, seeking to preclude positive feedback from being included in her review.

250. The Defendants likewise challenged and undermined Steed's authority as CEO of MetroHealth.

251. Upon information and belief, the Defendants rejected Steed as an African American leader and discriminated against her as a result of her status as a minority.

252. When Steed spearheaded a separation agreement with Defendant Rajki and Defendant McBride due to their inappropriate conduct at MetroHealth, Defendant Walker informed Steed that no action would be taken with respect to Defendant McBride's separation agreement and that the Board intended to keep Defendant McBride as an employee working with the MetroHealth Board, despite her well-documented discrimination against Steed.

47

253. As a result, Steed submitted a written complaint of this discrimination on July 16, 2024, which was never investigated and was certainly never stopped by the Board

254. Less than one month later, Steed's Employment Agreement was terminated by Defendants and Steed was replaced by a Caucasian female

255. As an African American, Steed is a member of a protected class.

256. As detailed above, Steed endured discriminatory conduct from Defendants, among other employees, officers, and executives at MetroHealth.

257. Defendants had actual knowledge of such conduct and participated in it, acting with actual malice.

258. Steed suffered numerous employment actions as a result of the discrimination, including a biased 360 Review, inability to hire her own team, and ultimately the termination of her Employment Agreement while on approved FMLA leave and was replaced by a Caucasian female who was not subjected to the same competitive nationwide search

259. Defendants' conduct violates Ohio Revised Code 4112, which prohibits unlawful discriminatory practices.

260. Steed received a Notice of right to Sue from the OCRC and EEOC. *See* Exhibits A and B hereto.

261. As a result of the aforementioned conduct, Defendants are liable to Steed for compensatory and punitive damages, emotional distress damages, attorneys' fees and costs, witness fees, expert fees, interest and any additional legal or equitable relief that this Court deems just and appropriate, in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

**COUNT VIII – RACIAL DISCRIMINATION- TITLE VII OF THE FEDERAL CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e**
**(As to Defendant MetroHealth)**

262.     Plaintiff reincorporates all preceding Paragraphs of this Complaint as if fully restated herein.

263.     Shortly after beginning her role as CEO at MetroHealth, Steed encountered racial discrimination  from colleagues at MetroHealth.

264.     Defendant Rajki, Defendant McBride, Defendant Partington, and Defendant Barre brought unfounded accusations against Steed to the Board behind Steed's back, including false and defamatory accusations and discriminated against her  and created a toxic work environment.

265.     Rather than put a stop to such discriminatory and harassing conduct, the Board Defendants, fully aware of such conduct, did not stop the conduct and instead took steps to retain the individuals involved the discriminatory conduct.

266.     Upon information and belief, such conduct persisted and worsened at the hands of the Board Defendants.

267.     After receiving written reports of such racial discrimination from Steed herself, the Defendants did not stop such conduct.

268.     One anonymous written complaint stated that the Defendants "are racists and don't want or like black people taking over the hospital" and that the MetroHealth leaders have "secret backdoor meetings working against the new leaders because they are Black."

269.     The Defendants also received notice of such discrimination through anonymous complaints submitted by individuals other than Steed.

270.    Steed demonstrated strong and high-level performance as MetroHealth's CEO, where she received a high ranking in her 360 employment review, received national awards and accolades and positive attention to MetroHealth and was nonetheless subjected to continued mistreatment.  Steed was qualified for her position and was offered the position as CEO after a competitive nationwide search for the role.

271.    Further, the Defendants discriminated against Steed when conducting her 360 Review.

272.    The Defendants prevented the majority of Steed's direct hires from participating in her 360 Review, seeking to preclude positive feedback from being included in her review.

273.    The Defendants likewise challenged and undermined Steed's authority as CEO of MetroHealth.

274.    Upon information and belief, the Defendants rejected Steed as an African American leader and discriminated against her as a result of her status as a minority in violation of the Civil Rights Act.

275.    When Steed spearheaded a separation agreement with Defendant Rajki and Defendant McBride due to their inappropriate conduct at MetroHealth, Defendant Walker informed Steed that no action would be taken with respect to Defendant McBride's separation agreement and that the Board intended to keep Defendant McBride as an employee working with the MetroHealth Board, despite her well-documented discrimination against Steed.

276.    As a result, Steed submitted a written complaint of this  discrimination on July 16, 2024, which was never investigated and was certainly never stopped by the Board.  Less than one month later, Steed's Employment Agreement was terminated by Defendants and Steed was replaced by

a Caucasian female while on approved FMLA leave who was not subjected to the same competitive nationwide search as Steed.

277.    As an African American, Steed is a member of a protected class.

278.    As detailed above, Steed endured discriminatory conduct from Defendants, among other employees, officers, and executives at MetroHealth all in violation of the Civil Rights Act.

279.    Defendants had actual knowledge of such conduct and participated in it, acting with actual malice.

280.    Steed suffered numerous employment actions as a result of the discrimination, including a biased 360 Review, inability to hire her own team, replacement with an individual not in her protected class and ultimately the termination of her Employment Agreement.

281.    Defendants' conduct violates the Civil Rights Act, which prohibits such unlawful discriminatory practices.

282.    Steed filed a Charge with the Ohio Civil Rights Commission and EEOC for the discriminatory conduct on October 30, 2024, Charge No. 22A-2025-00605/ OCRC Case No. CLEB4(010743).

283.    Steed received a Notice of right to Sue from the OCRC and EEOC.  *See* Exhibits A and B hereto.

284.    As a result of the aforementioned conduct, Defendants are liable to Steed for compensatory and punitive damages not to mention significant harm to her professional reputation, emotional distress damages, attorneys' fees and costs, witness fees, expert fees, interest and any

additional legal or equitable relief that this Court deems just and appropriate, in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

## COUNT IX- HOSTILE WORK ENVIRONMENT
### (As to Defendant MetroHealth, Defendant Rose, Defendant McBride, Defendant Rajki, Defendant Partington, and Defendant Barre)

285.    Plaintiff reincorporates all preceding Paragraphs of this Complaint as if fully restated herein.

286.    As described above, Defendant Rajki,  Defendant McBride, Defendant Rose, Defendant Partington, and Defendant Barre attempted to undermine Steed at every turn and subjected Steed to unfair scrutiny from the outset of her employment.

287.    Shortly after beginning her role as CEO at MetroHealth, Steed encountered discriminatory, harassing, and hostile discrimination and retaliation from colleagues at MetroHealth.

288.    Defendant Rajki, Defendant McBride, Defendant Partington, and Defendant Barre brought unfounded accusations against Steed to the Board behind Steed's back, including false and defamatory accusations.

289.    Defendant Rose initiated and spearheaded a smear campaign against Steed and solicited negative feedback among MetroHealth employees, physicians and leaders in an attempt to harass and undermine Steed and aid in her unlawful termination

290.    Rather than put a stop to such discriminatory and harassing conduct, the Board Defendants, fully aware of such conduct, did not stop the conduct and instead took steps to retain the individuals involved the discriminatory conduct.

291.    Upon information and belief, such conduct persisted and worsened at the hands

of the Board Defendants.

292.    After receiving written reports of such racial discrimination, harassment, and hostile work environment from Steed herself, the Defendants did not stop such conduct.

293.    One anonymous written complaint stated that the Defendants "are racists and don't want or like black people taking over the hospital" and that the MetroHealth leaders have "secret backdoor meetings working against the new leaders because they are Black."

294.    The Defendants also received notice of such harassment and discrimination through anonymous complaints submitted by individuals other than Steed.

295.    Steed demonstrated strong and high-level performance as MetroHealth's CEO, received a high ranking in her 360 employment review, received national awards and accolades and positive attention to MetroHealth and was nonetheless subjected to continued mistreatment.

296.    Further, the Defendants discriminated against Steed when conducting her 360 Review.

297.    The Defendants prevented the majority of Steed's direct hires from participating in her 360 Review, seeking to preclude positive feedback from being included in her review.

298.    The Defendants likewise challenged and undermined Steed's authority as CEO of MetroHealth.

299.    Upon information and belief, the Defendants rejected Steed as an African American leader and discriminated against her as a result of her status as a minority.

300.    When Steed spearheaded a separation agreement with Defendant Rajki and Defendant McBride due to their inappropriate conduct at MetroHealth, Defendant Walker informed Steed that no action would be taken with respect to Defendant McBride's separation agreement and that the Board intended to keep Defendant McBride as an employee working with the MetroHealth Board, despite her well-documented harassment, discrimination, and undermining of Steed.

301.    As a result, Steed submitted a written complaint of this toxic work environment, harassment and discrimination on July 16, 2024, which was never investigated by the Board

302.    Less than one month later, Steed's Employment Agreement was terminated by Defendants and Steed was replaced by a Caucasian female

303.    As an African American, Steed is a member of a protected class.

304.    As detailed above, Steed endured discriminatory, retaliatory, and harassing conduct and toxic work environment from Defendants.

305.    Defendants had actual knowledge of such conduct and participated in it, acting with actual malice.

306.    Steed suffered numerous employment actions as a result of the harassment and discrimination, including a biased 360 Review, inability to hire her own team, and ultimately the termination of her Employment Agreement as well as being replaced by a Caucasian female.

307.    Steed filed a Charge with the Ohio Civil Rights Commission and EEOC for the illegal conduct on October 30, 2024, Charge No. 22A-2025-00605/ OCRC Case No. CLEB4(010743).

308.    Steed received a Notice of right to Sue from the OCRC and EEOC.  *See* Exhibits A and B hereto.

309. As a result of the aforementioned conduct, Defendants are liable to Steed for compensatory and punitive damages, pain and suffering damages, back pay, front pay, reinstatement with all previously existing rights and benefits, attorneys' fees and costs, witness fees, expert fees, interest and any additional legal or equitable relief that this Court deems just and appropriate, in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

## COUNT X- INVASION OF PRIVACY
### (As to Defendant MetroHealth)

310. Plaintiff reincorporates all preceding Paragraphs of this Complaint as if fully restated herein.

311. As described above, upon information and belief MetroHealth accessed Steed's health records without Steed's permission.

312. Upon information and belief, MetroHealth also shared that health information with their counsel at Taft, as evidenced in the position statement Taft submitted to the EEOC on behalf of MetroHealth.

313. A copy of the EEOC Position Statement is not attached hereto as an exhibit to this Complaint because Steed does not waive any rights related to her confidentiality; however, Defendants have a copy of that Position Statement, and a copy can be furnished to the Court under seal upon request.

314. MetroHealth is a covered entity pursuant to HIPAA.

315. MetroHealth owed Steed a duty of care.

316. Upon information and belief, the medical records constitute Steed's personal health information (PHI).

317. By accessing Steed's PHI without permission or excuse, MetroHealth violated Steed's privacy and confidentiality rights.

318.     By sharing Steed's PHI without permission or excuse with their counsel at Taft, MetroHealth violated Steed's privacy and confidentiality rights.

319.     By discussing Steed's PHI within their Position Statement, MetroHealth publicized Steed's private health information without permission, consent, or privilege to do so.

320.     As a result of this violation, Steed's PHI was improperly disclosed by MetroHealth to MetroHealth employees, MetroHealth's counsel at Taft, and the EEOC.

321.     This improper conduct constitutes a wrongful invasion of Steed's private health information.

322.     Such improper conduct would shock the conscience and would be highly offensive to a reasonable person.

323.     This improper conduct is particularly offensive in light of MetroHealth's harassing, discriminating, and unlawful conduct to Steed.

324.     This improper conduct did cause mental anguish, suffering, and offense to Steed.

325.     As a result of the aforementioned conduct, Defendant is liable to Steed for compensatory and punitive damages, emotional distress damages, attorneys' fees and costs, witness fees, expert fees, interest and any additional legal or equitable relief that this Court deems just and appropriate, in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

## PRAYER FOR RELIEF

WHEREFORE, Steed prays that the Court issue relief as follows:

1.  As to Count I , for amount to be  proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00), plus prejudgment   and post-judgment interest at the statutory rate of interest, and  immediate  payment  of  all  entitlements  from  the  contracts  between  Steed  and MetroHealth.

2. As to Count II, for economic and non-economic damages, emotional distress damages, reinstatement, back wages, restoration of  benefits and rights, attorney's fees and costs, witness fees, expert fees, punitive damages, interest, and any additional legal or equitable relief that this Court deems appropriate in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

3. As to Count III, for economic and non-economic damages, reinstatement, back wages, restoration of benefits and rights, attorney's fees and costs, witness fees, expert fees, punitive damages, interest, and any additional legal or equitable relief that this Court deems appropriate in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

4. As to Count IV, for compensatory damages, emotional distress damages, punitive damages, back pay, front pay, reinstatement with all previously existing rights and benefits, attorneys' fees and costs, witness fees, expert fees, interest and any additional legal or equitable relief that this Court deems just and appropriate, in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

5. As to Count V, for compensatory and punitive damages, non-economic damages including public retraction, emotional distress damages, attorneys' fees and costs, witness fees, expert fees, interest and any additional legal or equitable relief that this Court deems just and appropriate, in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

6.  As to Count VI, for economic and non-economic damages, reinstatement, back wages, restoration of benefits and rights, attorney's fees and costs, witness fees, expert fees, punitive damages, interest, and any additional legal or equitable relief that this Court deems appropriate in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

7.  As to Count VII, for economic and non-economic damages, reinstatement, back wages, restoration of benefits and rights, attorney's fees and costs, witness fees, expert fees, punitive damages, interest, and any additional legal or equitable relief that this Court deems appropriate in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

8.  As to Count VIII, for economic and non-economic damages, reinstatement, back wages, restoration of benefits and rights, attorney's fees and costs, witness fees, expert fees, punitive damages, interest, and any additional legal or equitable relief that this Court deems appropriate in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

9.  As to Count IX, for economic and non-economic damages, reinstatement, back wages, restoration of benefits and rights, attorney's fees and costs, witness fees, expert fees, punitive damages, interest, and any additional legal or equitable relief that this Court deems appropriate in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

10. As to Count X, for compensatory and punitive damages, non-economic damages, emotional distress damages, attorneys' fees and costs, witness fees, expert fees, interest and any additional legal or equitable relief that this Court deems just and appropriate, in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

11. All other relief which this Court deems reasonable, just and equitable.

Respectfully submitted,

*/s/ Ezio A. Listati*
Todd C. Hicks (0063255)
Ezio A. Listati (0046703)
Elizabeth E. Collins (0091032)
THRASHER DINSMORE & DOLAN, LPA
1282 West 58th Street
Cleveland, OH  44102
(216) 255-5431 | (216) 255-5450 (fax)
thicks@tddlaw.com | elistati@tddlaw.com | ecollins@tddlaw.com

*Attorneys for Plaintiff Dr. Airica Steed*

## JURY DEMAND

Plaintiff hereby  demands a trial by jury comprised of the maximum number of jurors allowed by law.

*/s/Ezio A. Listati*
Ezio A. Listati (0046703)

*One of the Attorneys for Plaintiff Dr. Airica Steed*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 7, 2025 a true and accurate copy of the foregoing was filed electronically via the Court's electronic filing system and will be served on counsel for the parties by operation of the Court's ECF system.

<div style="margin-left: 50%;">

<u>/s/Ezio A. Listati</u>
Ezio A. Listati (0046703)

*One of the Attorneys for Plaintiff Dr. Airica Steed*

</div>