## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

Airica Steed,                                    Case No. 1:25-cv-00443-PAB

        Plaintiff,

        -vs-

                                **JUDGE PAMELA A. BARKER**

The MetroHealth System, et al.,

        Defendants.                          **MEMORANDUM OPINION & ORDER**

Currently pending before the Court is Defendants The MetroHealth System, ("MetroHealth"), John Moss ("Moss"), Tamiyka Rose ("Rose"), E. Harry Walker, M.D. ("Walker"), Laura McBride ("McBride"), Sonja Rajki ("Rajki"), Sarah Partington ("Partington"), and Robin Barre's ("Barre") (collectively, "Defendants"), Motion to Dismiss (the "Motion" or "Motion to Dismiss"). (Doc. No. 19.) On July 14, 2025, Plaintiff Airica Steed ("Steed") filed her Opposition, to which Defendants replied on July 28, 2025. (Doc. Nos. 26, 27.) For the following reasons, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part as follows. The Court finds that Counts IV and V of the Second Amended Complaint state plausible claims for relief, except that, Steed's wrongful discharge claim fails to state a claim to the extent it is premised upon Ohio Revised Code § 2921.12, Steed's defamation claim fails to state a claim based upon the alleged statements in Paragraph 210 of the Second Amended Complaint, and Steed's defamation claim fails to state a claim based upon the alleged "statements by Defendant Walker at internal MetroHealth Board meetings and Foundation Board meetings," which are alleged in Paragraph 214 of the Second Amended Complaint.

## I.     Allegations in the Second Amended Complaint

Defendants move to dismiss Counts IV and V of the Second Amended Complaint. The

following factual allegations are relevant to those claims.

**A.     Steed is hired by MetroHealth to be its next CEO**

In early 2022, MetroHealth began a competitive nationwide search for a new CEO to replace its then current CEO, Dr. Akram Boutros.  (Doc. No. 17, ¶ 15.)  "Steed was solicited for the replacement CEO position … based on her extensive executive leadership experience and track record of high performance, most recently serving in a similar capacity at a health system in Chicago, Illinois and received a 'Leadership Profile' from Witt Kieffer, an executive search company." (*Id.* at ¶ 16.)  On or about September 21, 2022, Steed signed an Employment Agreement "with MetroHealth to serve as President and Chief Executive Officer [] of MetroHealth effective January 1, 2023." (*Id.* at ¶ 18.)  Shortly thereafter MetroHealth "asked Steed to begin her role as CEO of MetroHealth earlier on December 5, 2022, and Steed agreed." (*Id.* at ¶ 21.)

**B.     After starting as CEO, Steed alleges that Defendants discriminated and harassed her**

Immediately upon commencing her job as CEO of MetroHealth, Steed began to experience discrimination, harassment, unfounded accusations, and a toxic work environment from many of the Defendants in this action, including McBride, Rajki, Rose, Partington, Barre, Walker, Moss, as well as other employees, executives and officers of or at MetroHealth. (*Id.* at ¶ 24.)  MetroHealth subjected Steed to a heightened degree of scrutiny, oversight and control that no MetroHealth CEO outside her protected class had faced previously through no fault of Steed.  (*Id.*)  Several MetroHealth Board members and MetroHealth's co-General Counsels at the time, McBride and Rajki, sought to undermine Steed on a consistent basis and her authority as CEO was constantly challenged and interfered with.  (*Id.* at ¶ 25.)  McBride and Rajki consistently acted with malice and calculation to create division between Steed, the Board and its Chair.  (*Id.*)  Walker "enabled and encouraged this

2

oppressive work environment." (*Id.* at ¶ 26.)

As a result of this conduct, Steed encountered discriminatory, harassing, and oppressive discrimination and retaliation from colleagues at MetroHealth.  (*Id.* at ¶ 27.)  Shortly after Steed began to work as CEO of MetroHealth, Rajki told Steed that she was "guilty until proven innocent." (*Id.* at ¶ 28.)

Additionally, "Defendant McBride, Defendant Rajki, Defendant Partington, and Defendant Barre brought several unfounded accusations about Steed to the Board behind Steed's back, including false, frivolous and defamatory accusations." (*Id.* at ¶ 30.)  "These allegations included claims about allegedly using private drivers and planes improperly, improper hiring practices, having multiple DUIs and excessive drinking which were false, frivolous and defamatory, among others."  (*Id.*) "[T]he legal and compliance teams, including Defendant McBride, Defendant Rajki, Defendant Partington, and Defendant Barre did not conduct any due diligence to determine if the allegations had merit, including reviewing objective evidence to refute allegations, nor did they engage Human Resources or Steed directly." (*Id.* at ¶ 31.)  "Had Defendant McBride, Defendant Rajki, Defendant Partington, or Defendant Barre simply investigated the truth of these accusations rather than repeating them to others including the Board, they would have learned that they were false." (*Id.* at ¶ 32.)

"Examples of other defamatory statements made about Steed include, but are not limited to, Defendant Walker's statement on behalf of the Board indicating that Steed's Employment Agreement was terminated due to Steed's job performance, when the Board's termination notice stated that the termination was not for cause, and statements by Defendant Walker at internal MetroHealth Board meetings and Foundation Board meetings." (*Id.* at ¶ 214.)  Also, "Defendant Moss falsely informed other MetroHealth Board members that Steed was colluding with Boutros, which was a false

3

statement."  (*Id.* at ¶ 220.)

Defendants never "sought to learn the truth (or, in this case, lack thereof) behind those unfounded accusations from Steed herself, and no Board member, or Defendant McBride, Defendant Rajki, Defendant Rose, Defendant Partington, or Defendant Barre was subject to any consequence for making such false, reckless, and defamatory accusations."  (*Id.* at ¶ 33.)  "[S]everal other frivolous complaints, some of which were anonymous, regarding Steed were allegedly 'submitted' by Defendant Partington or Defendant Barre in MetroHealth's Compliance Department to Defendant McBride and Defendant Rajki, who did not take any steps to investigate their truth prior to submitting them to the Board behind Steed's back. Subsequent investigation, conducted only after Defendant McBride and Defendant Rajki submitted them to the Board, demonstrated that these allegations had no merit."  (*Id.* at ¶ 34.)

"On or about January of 2024, the Board hired Defendant Rose as Board Liaison."  (*Id.* at ¶ 37.)  "Defendant Rose was hired to serve as a bridge between administration and the Board, create standard processes and facilitate stronger relationships."  (*Id.*)  "Defendant Rose did nothing to prevent or stop [the] incessant harassment of Steed, toxic work environment or discrimination against Steed based on being the first African American CEO at MetroHealth."  (*Id.*)  "Instead, Defendant Rose perpetuated and aided the wrongful conduct and toxic work environment, including soliciting frivolous complaints among MetroHealth employees, distributing Board members' contact information to MetroHealth employees to provide comments about Steed, and spearheading a smear campaign against Steed, which was reflected in several complaints submitted to the MetroHealth Ethics Line "MEL" and was witnessed by many MetroHealth employees. Defendant Rose was weaponized to create disruption, interference, and division between Steed and the Board."  (*Id.*)

4

Additionally, "Defendant Rose harassed Steed and sought to investigate Steed's travel expenses, attempting to find fault with Steed's travel to no avail." (*Id.* at ¶ 210.) Further, "Defendant Moss and Defendant Rose spread false information about Steed's travel frequency and expenses to others at MetroHealth." (*Id.* at ¶ 221.)

Steed alleges that she "complied with her obligations as CEO of MetroHealth and acted in accordance with her job duties as described to her." (*Id.* at ¶¶ 40–45.) Yet, according to Steed, "the Board did little to nothing to protect Steed from discrimination, harassment and a toxic work environment, and several Board members joined in other Defendants' efforts to unfairly discredit and undermine Steed and discriminate against her and took the frivolous complaints escalated above her head at face value, …." (*Id.* at ¶ 46.) Steed "raised and escalated her concerns regarding discrimination, harassment, and toxic work environment and governance concerns to several parties both verbally and in writing" and "made multiple attempts to achieve an amicable resolution." (*Id.* at ¶ 51.) "On or around July 16, 2024, Steed filed a formal complaint outlining the discrimination, harassment and toxic work environment, which was never formally investigated by the Board although acknowledged by Board Member Sharon Dumas." (*Id.* at ¶ 52.)

### C.    Steed investigates and reports what she believes is felonious conduct

"[A] month after Dr. Boutros's abrupt departure from MetroHealth as its CEO in November 2022 and prior to his previously planned retirement date, Board Member Terry Monnolly abruptly resigned from the Board in December 2022. (*Id.* at ¶ 55.) Then, "in approximately November 2022 and prior to his previously planned retirement date, MetroHealth's CFO Craig Richmond left his employment with MetroHealth on or about March 2023." (*Id.* at ¶ 56.) "Mr. Richmond's departure coincided with the release of an independent audit assessment conducted by the accounting firm BDO

and the allegation that proper controls were not enforced pertaining to the payment of supplemental bonuses to the former CEO." (*Id.* at ¶ 57.) "Mr. Richmond was succeeded by Derrick Hollings as MetroHealth's new CFO on or about September of 2023." (*Id.* at ¶ 58.)

On or about mid to late March of 2024, Steed learned from Mr. Hollings that he discovered that:  (1) "[h]undreds of millions of dollars were at risk;" (2) "[t]iming components of certain loans and sources of funding were never fully activated, including the Apex ambulatory development not being included in the bond for campus expansion and was pending final approval from the Board for completion;" (3) "[m]any years' worth of Mr. Richmond's e-mails in the MetroHealth computer system were conspicuously missing, despite MetroHealth's retention policy requiring their preservation;" (4) "[o]ther MetroHealth executive leaders' emails and files associated with the ongoing criminal investigation were missing;" and (5) "[t]he hard drive containing Mr. Richmond's records was missing." (*Id.* at ¶ 59.)  According to Steed, "[t]he missing records were nothing short of a 'surgical removal' of years of MetroHealth records, which are public records." (*Id.* at ¶ 60.)

"Because the missing records were former CFO records, Steed believed that some of those records would have related to approximately $1 billion in bond dollars[,]" which "were still active at the time that Steed raised her missing records concerns." (*Id.* at ¶ 61.)  "Steed learned of this 'surgical removal' of the former CFO's public records after a criminal investigation into Dr. Boutros's conduct while acting as MetroHealth's CEO had begun." (*Id.* at ¶ 62.)

"Steed had reason to believe that this 'surgical removal' amounted to a violation of several Ohio laws, including felonies, and may have also been done to cover up additional illegal and possibly felonious conduct, including potential fraud related to the construction financing, and obstruct and tamper with an ongoing criminal investigation." (*Id.* at ¶ 63.)  "At this time, many accusations had

6

been made pertaining to the former CEO – Dr. Akram Boutros, including concerns raised during the BDO assessment potentially involving Terry Monnolly, as well as the history of corruption and legal and ethical misconduct of former MetroHealth executives, including former executive Ed Hills who was found guilty of racketeering and other related crimes."  (*Id.*)

"Steed verbally instructed Mr. Hollings to investigate the missing information and public records further with MetroHealth's Chief Information Officer David Fiser, who reported directly to Mr. Hollings to validate the concerns and to determine a justification for their absence.  (*Id.* at ¶ 64.) "Steed then learned through Mr. Hollings' investigation and by admission from David Fiser that Defendant McBride and Defendant Rajki, by text messages and/or email messages, had ordered one or several individuals from the MetroHealth IT department to delete these records and that IT was acting based on the specific instructions from the legal department."  (*Id.* at ¶ 65.)  "Additionally, it was also learned through this preliminary investigation that the MetroHealth IT department was instructed by the legal department to delete records of other former executives in addition to Craig Richmond, former CFO."  (*Id.*)

"On or about March of 2024, Defendant Moss became Vice Chair of MetroHealth's Board and maintained his role as Chair of the Finance Committee of the Board, a role that he also had during Dr. Akram Boutros' tenure as CEO."  (*Id.* at ¶ 67.)  "Steed instructed Mr. Hollings verbally to inform Defendant Moss about his findings about the deletion of MetroHealth public records and her concerns about criminal misconduct given his role as Chair of Finance Committee and liaison with the CFO and Treasurer, one of the primary subjects of these concerns."  (*Id.* at ¶ 68.)

"Mr. Hollings verbally reported these concerns to Defendant Moss on or around April 2024, who immediately dismissed the concerns and instructed him not to investigate further."  (*Id.* at ¶ 69.)

"[A]fter Steed expressed her concerns about miss/deleted records, on or about April of 2024, Ernst & Young ("E&Y") began to conduct an internal audit risk assessment for MetroHealth in which it was reported that there were concerns regarding deleted emails and missing public records related to the former CFO and other MetroHealth executives, which was a potential risk for criminal activity and potentially fraudulent activity."  (*Id.* at ¶ 70.)  "E&Y indicated to Steed . . . that they recommended a full forensic assessment be completed before they could move forward with the internal audit work.  (*Id.* at ¶ 71.)

"E&Y informed the Board of its preliminary findings during a Board meeting on or about late June 2024."  (*Id.* at ¶ 72.)  "E&Y informed the Board both verbally and in writing in June 2024 that it could not do any further work on its internal audit risk assessment without a full forensic audit and review of all information related to the missing information."  (*Id.* at ¶ 73.)  "Steed requested that MetroHealth comply with E&Y's request, and the Board overruled this request, obstructing the internal audit and forensic computer record investigation."  (*Id.* at ¶ 74.)

"Around this time, in May of 2024, the Board began excluding Steed from Board meetings and began to discuss issues without Steed's involvement or participation, although members of the management team were included in Board meetings and discussions including Defendant McBride and Defendant Rose, with McBride being a direct report of Steed."  (*Id.* at ¶ 76.)  "At this point, Steed began to suspect Board involvement in the felonious and criminal misconduct."  (*Id.* at ¶ 77.)  Steed alleges that she took various steps to investigate the alleged misconducted and she "began escalating [her] concerns, both verbally and in writing, including the missing/deleted emails, the undermining, the toxic work environment and harassment, and the racism/discrimination she encountered at MetroHealth reporting her concerns to the Board."  (*Id.* at ¶ 84.)

8

### D.  MetroHealth terminates Steed's employment

"On or about July 19, 2024, as a result of the continued harassment, discrimination, and toxic work environment that she was subjected to, Steed sought medical care for a serious medical condition."  (*Id.* at ¶ 101.)  "Thereafter, Steed submitted information regarding her medical issues to MetroHealth and began MetroHealth approved continuous FMLA leave from July 22, 2024 through September 2, 2024 as a result of her serious medical condition."  (*Id.* at ¶ 102.)

"On August 9, 2024, after engaging in protected activity including submitting a formal complaint, Steed was unceremoniously and publicly terminated while on approved FMLA, which she initially learned through the media, not through a discussion with any Board member."  (*Id.* at ¶ 112.) "Shortly thereafter, Steed received a letter from Defendant Walker on behalf of MetroHealth indicating that MetroHealth 'voted to terminate your employment Agreement' and that such termination was 'without cause.'"  (*Id.*)

"This abrupt change in the reason for terminating Steed's employment shortly after she began FMLA leave demonstrates that MetroHealth terminated Steed's employment as unlawful retaliation for taking FMLA leave, among other potential unlawful bases for such termination, and her FMLA rights were unlawfully interfered with by MetroHealth."  (*Id.* at ¶ 114.)  Steed also alleges that "[t]he decision to terminate Steed's employment shortly after she both verbally and in writing reported her reasonable suspicion of ethical, legal and potentially criminal misconduct . . . demonstrates that MetroHealth violated Ohio's Whistleblower Protection Statute, among other potential unlawful bases for such termination."  (*Id.* at ¶ 115.)  According to Steed, "Defendants' conduct violates Ohio Revised Code 4112, which prohibits unlawful discriminatory practices" and violates the Civil Rights Act of 1964, 42 U.S.C. 2000e."  (*Id.* at ¶ 133.)

Then, Steed alleges, "Defendants issued false statements in Press Releases disparaging Steed accusing her of performance issues, which was not only published locally but also nationally." (*Id.* at ¶ 204.) "These false and disparaging statements are in direct conflict with the actual facts about Steed's job performance" and "are also factually inaccurate because the 'for cause' reasons given to the media and public at large are inconsistent with the explicit representation communicated that the Board elected to terminate the Employment Agreement 'without cause.'" (*Id.* at ¶ 205.) "[T]he MetroHealth Board leaked Steed's travel expenses as CEO of MetroHealth to the press following the termination of her Employment Agreement." (*Id.* at ¶ 206.) According to Steed "any such statements to the press implying that Steed was terminated as a result of travel time or expenses is inaccurate and defamatory, attempting to unfairly cast blame on Steed for her termination which was in truth a termination without cause." (*Id.* at ¶ 207.)

"Following Steed's termination 'not for cause', MetroHealth, through Defendant Walker, issued a defamatory public statement indicating that Steed's termination was in fact 'for cause', stating:

> It has become clear that the Board and Steed fundamentally disagree about the priorities and performance standards needed from our CEO for MetroHealth to fulfill its mission . . .
>
> [w]e believe Steed's performance is not meeting the needs of MetroHealth. As a result, we have lost confidence in her ability to lead the organization going forward and believe it would not be in the best interest of the System for her to continue in her position. Therefore, we are exercising our right to terminate her at-will contract. . . .
>
> We had high expectations when she arrived in 2022 and are sorry those expectations have not been met[.]"

(*Id.* at ¶ 142.)

Defendant Walker and the Board continued with their attempts to wrongly assassinate Steed's

10

character, and Defendant Walker issued a second statement doubling down on this position to SignalCleveland, stating:

> This was purely an issue of the CEO's failure to perform and entirely based on her direct interactions with the Board of Trustees. . . The performance issues that caused us to act are long-standing and were made clear to her on numerous occasions. She failed for months to address them. Because of that, we lost confidence in her ability to lead the System and felt we had no choice but to end her at-will employment agreement.

(*Id.* at ¶ 147.)  According to Steed, "[t]hese press releases were false and defamatory," and "the Board never had any meetings or conversations with Dr. Steed about any alleged performance issues." (*Id.* at ¶ 148.)

This lawsuit followed.

## II.  Procedural History

On February 3, 2025, Steed initiated this action by filing her initial Complaint against Defendants in the Cuyahoga County Court of Common Pleas.  (Doc. No. 1-2.)  On March 6, 2025, Defendants removed the case to this Court.  (Doc. No. 1.) On April 7, 2025, Steed filed her First Amended Complaint.  (Doc. No. 7.)   On May 7, 2025, Defendants filed a partial motion to dismiss the First Amended Complaint.  (Doc. No. 12.)

In response, Steed filed her Second Amended Complaint.  (Doc. No. 17.)  Therein, Steed brings eight claims for relief:  (1) Breach of Employment Agreement- Good Faith and Fair Dealing (As to Defendant MetroHealth); (2) Whistleblower Retaliation in Violation of R.C. 4113.52 (As to Defendant MetroHealth; (3) FMLA Retaliation (As to Defendant MetroHealth); (4) Wrongful Discharge in Violation of Public Policy (As to Defendant MetroHealth); (5) Defamation (As to Defendant MetroHealth, Defendant Rose, Defendant McBride, Defendant Rajki, Defendant Partington, Defendant Barre, Defendant Walker, and Defendant Moss)"; (6) FMLA Interference (As

11

to Defendant MetroHealth); (7) Racial Discrimination – R.C. 4112 (As to Defendant MetroHealth); and (8) Racial Discrimination – Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. 2000e (As to Defendant MetroHealth).  (*Id.*)

On June 12, 2025, Defendants filed the Motion to Dismiss.  (Doc. No. 19.)  Through the Motion to Dismiss, Defendants only request that the Court dismiss Steed's Wrongful Discharge in Violation of Public Policy and Defamation claims.  (*Id.*)  On July 14, 2025, Steed filed her Opposition, to which Defendants replied on July 28, 2025.  (Doc. Nos. 26, 27.)  Accordingly, Defendants' Motion to Dismiss is ripe for review.

## III.   Standard of Review

In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–556 (2007)).  For purposes of Rule 12(b)(6), "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citation and quotation marks omitted).

The measure of a Rule 12(b)(6) challenge — whether the Complaint raises a right to relief above the speculative level — "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting in part *Twombly,* 550 U.S. at 555–556).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting in part *Erickson v. Pardus*, 551 U.S. 89 (2007)). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

## IV. Analysis

### A. Steed alleges a plausible claim for Wrongful Discharge in Violation of Public Policy under Ohio law

Defendants first ask the Court to dismiss Steed's Wrongful Discharge in Violation of Public Policy claim. Under Ohio law, at-will employment "is terminable at the will of either party for any cause or no cause." *House v. Iacovelli*, 152 N.E.3d 178, 181 (Ohio 2020) (citing *Collins v. Rizkana*, 652 N.D.3d 653 (Ohio 1995)). The tort of termination in violation of public policy is an exception to this rule. *Id.* (citing *Greeley v. Miami Valley Maintenance Constrs.*, 552 N.E.2d 981 (Ohio 1990)). The elements of the tort are:

13

> 1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Allman v. Walmart, Inc.*, 967 F.3d 566, 574 (6th Cir. 2020) (quoting *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003)) (emphasis in original).   The "clarity" and "jeopardy" elements are questions of law for the court to decide.  *House*, 152 N.E.3d at 181 (citing *Collins*, 652 N.E.2d at 658).

Defendants assert that Steed has not sufficiently alleged the clarity and jeopardy elements of the tort.  The Court addresses the parties' arguments regarding each element in turn below.

### 1.    Steed sufficiently alleges the clarity element

Defendants argue that "[a] wrongful discharge plaintiff must identify a clear public policy set forth in a specific law."  (Doc. No. 19-1, PageID #708.)  According to Defendants, Dr. Steed does not do that because "[s]he points the Court to 'the Ohio and United States Constitutions, state law, administrative rules and regulations, and Ohio common law.'"  (*Id.*)  Defendants assert "that one might squint and find a vague reference to the Ohio Whistleblower Act (O.R.C. § 4113.52) or Ohio and Federal employment discrimination statutes (O.R.C. Chapter 4112 and 42 U.S.C. § 2000e)[,] [b]ut that is Defendants' best guess—specific statutory references are nowhere to be found in (sic) Count IV." (*Id.* at PageID #709.)  Defendants further assert that "even if Defendants do the lifting of identifying possible statutes, Dr. Steed still does not identify what 'clear' public policy her

14

termination might violate." (*Id.*)  According to Defendants, "Dr. Steed does not identify what the clear public policy is, nor does she sufficiently plead or cite to any specific law." (*Id.*)

In response, Steed argues that in pleading her *Greeley* claim, she "averred that Ohio and federal law manifest clear public policies concerning, among other things, public record retention, record retention related to bond financing, interference with criminal investigations, and tampering with evidence in criminal investigations." (Doc. No. 26, PageID #769.)  Steed asserts that her "complaint makes abundantly clear that she learned of, and instigated an investigation into, the removal of public records, which removal she believed occurred as part of an effort by Defendants to conceal unlawful activity and to 'tamper' with a criminal investigation." (*Id.*)  Steed contends that Count IV of her Second Amended Complaint "makes plain that among the public policies for which she was retaliated against is a policy prohibiting 'tamper[ing] with or destroy[ing] any records related to an ongoing or future criminal investigation or evidencing any criminal conduct[,]'" citing to paragraph 196 of the Second Amended Complaint.  Steed points to Ohio Rev. Code § 2921.12 titled "Tampering with evidence" as "at least one clear public policy that Steed articulated in her complaint." (*Id.*)  Steed also argues that she "is permitted to plead in the alternative and base her *Greeley* claim on Ohio's whistleblower statute." (*Id.* at PageID #770.)  Steed points out that *Dohme v. Eurance Am., Inc.*, 956 N.E.2d 825 (Ohio 2011), which Defendants rely on, was decided on summary judgment and "seemed to take for granted that a complaint need not satisfy the onerous standard Defendants apparently advance in their motion." (*Id.* at PageID #769.)

Defendants make three arguments in their Reply.  First, Defendants point to *Dohme* for the proposition that "the Ohio Supreme Court dismissed a wrongful termination claim because the plaintiff 'did not cite any specific statement of law in support of his claim of public policy that was

drawn from the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law.'" (Doc. No. 27, PageID #784–85.)  Second, Defendants assert that "Dr. Steed impermissibly seeks to amend the Complaint through her Opposition" because Ohio Rev. Code § 2921.12 "is neither cited nor discussed in her Complaint." (*Id.*)   Third, Defendants argues that Ohio Rev. Code § 2921.12 cannot satisfy the clarity element because it "stands in contrast to statutes that the Ohio Supreme Court has recognized articulate a clear public policy supporting a cause of action for wrongful termination as an exception to the general employment-at-will doctrine." (*Id.* at PageID #785–86.)

"The Ohio Supreme Court has imposed a strict, substantive burden on a plaintiff asserting a public policy to identify the law supporting that policy." *McCormick v. AIM Leasing Co.*, No. 4:11CV01524, 2012 U.S. Dist. LEXIS 164937, at *21–22 (N.D. Ohio Nov. 19, 2012).  "To satisfy the clarity element of a claim of wrongful discharge in violation of public policy, a terminated employee must articulate a clear public policy by citation to specific provisions in the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law." *Dohme v. Eurance Am., Inc.*, 956 N.E.2d 825, syllabus (Ohio 2011).  "[A] court may not presume to *sua sponte* identify the source of that policy." *Id.* at 831.

Defendants' summary of the Second Amended Complaint is disingenuous.  Steed does more than simply point the Court to "the Ohio and United States Constitutions, state law, administrative rules and regulations, and Ohio common law." (Doc. No. 19-1, PageID #708.)  Steed alleges:

> 195.  ***Defendants' conduct as described herein*** violated the clear public policy of Ohio as contained within the Ohio and United States Constitutions, state law, administrative rules and regulations, and Ohio common law, ***when Defendants . . . terminated her employment***, ***and otherwise retaliated against her because she reported and opposed unlawful conduct as described herein***.

(Doc. No. 17, ¶ 195 (emphasis added).)  Earlier in the Second Amended Complaint, Steed specifically points to Ohio's Whistleblower statute, as one of many reasons for why she believes her termination was unlawful.  She alleges that "[t]he decision to terminate Steed's employment  . . . demonstrates that MetroHealth violated Ohio's Whistleblower Protection Statute."  (*Id.* at ¶ 115.)[1]  The Court therefore rejects Defendants' argument that Steed has failed to "identify what the clear public policy is, nor does she sufficiently plead or cite to any specific law."

Even if Steed had not cited the whistleblower statute, as Defendants incorrectly argue, Steed would still have alleged the clarity element.  Defendants' Motion is premised upon the argument that Steed was required to specifically cite legal authority in her Second Amended Complaint to plead a wrongful discharge in violation of public policy claim.  Defendants have not cited any authority that holds that a plaintiff fails to allege the clarity element by simply omitting legal citation to alleged public policies in a complaint.  And the Court has not identified any.

*Dohme*, at first glance, appears to support Defendants' position.  In *Dohme*, the Ohio Supreme Court held that "[t]o satisfy the clarity element of a claim of wrongful discharge in violation of public policy, a terminated employee must articulate a clear public policy by citation to specific provisions in the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law." *Id.* at syllabus.  The plaintiff in *Dohme* "simply alleged that [the defendant's] actions 'jeopardize workplace safety.'" *Id.* at 830.  The defendant moved for summary judgment arguing that the plaintiff had "not identified a public policy applicable to the incident." *Id.*  The Ohio Supreme Court concluded that the plaintiff did not meet his reciprocal burden under Ohio's version of Rule 56

---

[1] And when confronted by Defendants' arguments, Steed asserts in her Opposition that she can "base her *Greeley* claim on Ohio's whistleblower statute."  (Doc. No. PageID #771.)

to identify the applicable public policy.  It found that:

> As the nonmovant, Dohme must show that the issue to be tried is genuine and may not rely merely upon the pleadings or upon unsupported allegations. *Shaw v. J. Pollock & Co.* (1992), 82 Ohio App.3d 656, 659, 612 N.E.2d 1295. The mere citation to the syllabus in *Pytlinski* is insufficient to meet the burden of articulating a clear public policy of workplace safety.  Further, Dohme only generally mentioned or identified any legal basis for a statewide policy for workplace health and safety Dohme did not cite any specific statement of law in support of his claim of public policy that was drawn from the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law. In contrast, the *Pytlinski* and *Kulch* plaintiffs both alleged that their respective employers had violated federal OSHA regulations. *Pytlinski*, 94 Ohio St.3d at 78, 760 N.E.2d 385 (the terminated employee alleged that he had delivered a memorandum to his employer detailing the violations of OSHA regulations that were occurring at the workplace); *Kulch*, 78 Ohio St.3d at 135, 677 N.E.2d 308 (the terminated employee alleged that after his verbal complaints of the health violations within the workplace were rebuffed by the employer, he had filed a written report with OSHA, which resulted in an on-site inspection and OSHA finding several violations of its standards). Thus, Dohme failed to establish the existence of a clear public policy applicable to him in this matter. Cf. *Lesko v. Riverside Methodist Hosp.*, 10th Dist. No. 04AP-1130, 2005 Ohio 3142, ¶ 35.

*Id.* at 830.

What *Dohme* teaches is that the plaintiff has the burden of identifying the source of the alleged public policy.  But *Dohme* does not instruct *when* the plaintiff must do so.  As Steed correctly points out in her Opposition, the court's analysis in *Dohme* suggests that a plaintiff can identify the source of the alleged public policy for the first time in response to a summary judgment motion.  *Cf. L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, No. 1:09cv913 (WOB), 2013 U.S. Dist. LEXIS 177, at *13 (S.D. Ohio Jan. 2, 2013) (analyzing whether counterclaimant identified the source of public policy on summary judgment when the counterclaimant did not cite to specific laws in his counterclaim). Indeed, the Ohio Court of Appeals has found, in a decision relied on by Defendants in their Motion to Dismiss, that "a plaintiff may use summary judgment materials to flesh out the public policy relied upon." *Heigel v. MetroHealth Sys.*, 241 N.E.3d 380, 387 (Ohio App. 8th Dist. 2024) (citing *Blackburn*

*v. Am. Dental Ctrs.*, 22 N.E.3d 1149 (Ohio App. 10th Dist. 2014) ("*Dohme* make clear, however, that beyond general principles of notice pleading, the plaintiff may use summary judgment materials to flesh out the public policy relied upon")).

Even under the federal pleading standard, the Court is not inclined to hold as a matter of law that alleging statements of Ohio public policy, without citing the *exact* authority that supports those statements of law, is insufficient to *plead* the clarity element. It seems unnecessarily harsh, and not in the interests of justice, to suggest that this hypothetical allegation would fail at the pleading stage:

> Ohio has a clear public policy prohibiting retaliatory employment action against injured employees, including injured employees who have not filed, instituted, or pursued a workers' compensation claim.

But this hypothetical allegation would not fail at the pleading stage:

> Ohio has a clear public policy prohibiting retaliatory employment action against injured employees, including injured employees who have not filed, instituted, or pursued a workers' compensation claim. *See Sutton v. Tomco Machining, Inc.*, 950 N.E.2d 938, 940 (Ohio 2011) (holding that "R.C. 4123.90 expresses a clear public policy prohibiting retaliatory employment action against injured employees").

Despite the lack of a legal citation, the former allegation would certainly put a defendant on "fair notice of what the . . . claim is and the grounds upon which it rests." *Gunasekera*, 551 F.3d at 466 (quoting *Erickson*, 551 U.S. at 93); *see also O'Conner v. Nationwide Children's Hosp.*, 219 F. Supp. 3d 673 (S.D. Ohio 2016) (finding that "wrongful discharge in violation of public policy is not a claim that requires the plaintiff to meet a heightened pleading standard").

To be clear, under *Dohme*, Steed carries the burden to identify the sources of the alleged public policies implicated in her wrongful discharge claim. Steed did just that by, at a minimum, citing the Whistleblower Statute and Ohio Revised Code § 2921.12 in her Opposition.[2] To the extent

---

[2] The Court presumes, without deciding, that Ohio courts would recognize Ohio Revised Code § 2921.12 as a "clear public policy." The parties have not identified, and the Court could not find, any authority pertaining to whether Ohio

Steed intends to rely on any other alleged public policy, *Dohme* requires her to identify the source of those supposed public policies.  If Defendants are still unsure about what the exact public policies are that Steed is alleging in her Second Amended Complaint, they are free to serve an interrogatory under Rule 33. *See* Fed. R. Civ. P. 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact").  But Steed's claim does not fail at the pleading stage because she did not *cite* the source of her public policy claim in the Second Amended Complaint. [3]

In sum, the Court finds that Steed has sufficiently alleged the clarity element of her wrongful discharge claim.

### 2.    Steed sufficiently alleges the jeopardy element

Defendants next argue in their Motion that "[a]ssuming Dr. Steed could satisfy the clarity element (she cannot), she still cannot establish a prima facie case of wrongful discharge in violation of public policy because alternative, adequate remedies exist."  (Doc. No. 19-1, PageID #709.) According to Defendants, "Dr. Steed cannot establish the jeopardy element because it is clear from her Complaint that adequate statutory remedies are available that adequately protect society's interests and vindicate Dr. Steed's statutory rights."  (*Id.* at PageID #710.)  They assert that "[i]f the Court and MetroHealth assume, for the purposes of this motion, that Dr. Steed's wrongful discharge claims are based on O.R.C. § 4113.52(D) & (E), the claim still fails because of the protections

---

Revised Code § 2921.12 articulates a clear public policy of Ohio.  The Court takes this approach because even if Ohio Courts do recognize Ohio Revised Code § 2921.12 as articulating a clear public policy of Ohio, as explained below, Steed has not sufficiently alleged the jeopardy element with respect to Ohio Revised Code § 2921.12.

[3] For all these reasons, the Court also rejects Defendants' argument that "Dr. Steed impermissibly seeks to amend the Complaint through her Opposition" because Ohio Rev. Code § 2921.12 "is neither cited nor discussed in her Complaint." Because Steed was not required to cite that statute in her Second Amended Complaint under *Dohme*, logically, she was not amending her Second Amended Complaint through her Opposition.  *See Heigel*, 241 N.E.3d at 387 ("a plaintiff may use summary judgment materials to flesh out the public policy relied upon").

provided by that statute." (*Id.* at PageID #711.)  They further assert that "[i]f the Court and MetroHealth assume Dr. Steed is alleging termination in violation of the public policies set forth under Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 2000e-2(a); or O.R.C. § 4112.02, the claim again must fail"  because "[t]hese statutes each contain remedies to protect Dr. Steed's rights, obviating the need for a common law action for wrongful discharge." (*Id.*)

In her Opposition, Steed argues that "this District has recognized the permissibility of pleading in the alternative." (Doc. No. 26, PageID #770.)  Steed asserts that she "has clearly articulated public policy apart from civil rights laws or the State's whistleblower statute." (*Id.* at PageID #771.)  She asserts that "[t]o hold that Steed, at the pleading stage, has not satisfied the jeopardy element would require holding that public policy is not jeopardized when an employer terminates an employee because she has opposed the destruction of public records or opposed tampering with criminal investigations and destroying records related to ongoing or threatened civil litigation." (*Id.*)  Steed cites to *Wells v. Russ' Steamer Serv., LLC*, No. 3:23-cv-105, 2023 U.S. Dist. LEXIS 159949 (S.D. Ohio Sept. 8, 2023) for the proposition that "a sister court has recently held that the existence of statutory remedies via this state's whistleblower statute does not necessarily dispose of a *Greeley* claim based on that statute, at least at the pleading stage." (*Id.*)

In their Reply, Defendants argue that "[a]lthough framing it as alternative pleading may be novel, courts have rejected similar attempts to avoid dismissal of a wrongful discharge claim." (Doc. No. 27, PageID #787.)  Defendants next argue that Steed's citation to *Wells* fails because (1) "Dr. Steed did not plead that Ohio's whistleblower statute was jeopardized by her termination;" (2) "even if Wells authorized a wrongful discharge claim when the plaintiff could obtain relief under the whistleblower statute, that holding conflicts with the Sixth Circuit's clear statement of law that 'Ohio

common law does not recognize an action for wrongful discharge where a statutory remedy exists;'" and (3) "the Opposition only asserts that the clarity argument is satisfied because of the tampering statute; it does not argue that the whistleblower statute is a sufficiently clear public policy." (*Id.*)

The Court rejects Defendants' arguments.   Under Ohio law:

An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful discharge claim. . . . Where, as here, the sole source of the public policy opposing the discharge is a statute that provides the substantive right and remedies for its breach, "the issue of adequacy of remedies" becomes a particularly important component of the jeopardy analysis. . . . Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.

*Carrasco v. NOAMTC Inc.*, 124 F. App'x 297, 304 (6th Cir. 2004) (quoting *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 531 (Ohio 2002)).  Therefore, "when a statutory scheme contains a full array of remedies, the underlying public policy will not be jeopardized if a common-law claim for wrongful discharge is not recognized based on that policy."  *Leinger v. Pioneer Nat'l Latex*, 875 N.E.2d 36, 42 (Ohio 2007).   Under this framework, the Ohio Supreme Court has found that certain statutory schemes, like the FMLA or Ohio's civil rights statutes for example, cannot serve as the basis for a wrongful discharge claim. *See id.* at 44 ("We therefore hold that a common-law tort claim for wrongful discharge based on Ohio's public policy against age discrimination does not exist, because the remedies in R.C. Chapter 4112 provide complete relief for a statutory claim for age discrimination"); *Wiles*, 773 N.E.2d at 534 ("There is accordingly no need to create by judicial fiat further remedies by way of a *Greeley* claim when the FMLA provides reasonably satisfactory ones").

But the Ohio Supreme Court has not found the same with respect to Ohio's whistleblower statute.  In *Kulch v. Structural Fibers*, 677 N.E.2d 308 (Ohio 1997), the court held, in relevant part, that: (1) "R.C. 4113.52 does not preempt a common-law cause of action against an employer who

22

discharges or disciplines an employee in violation of that statute;" (2) "[a]n at-will employee who is discharged or disciplined in violation of the public policy embodied in R.C. 4113.52 may maintain a common-law cause of action against the employer pursuant to *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St. 3d 228, 551 N.E.2d 981, and its progeny, so long as that employee had fully complied with the statute and was subsequently discharged or disciplined;" and (3) "[a]n at-will employee who is discharged or disciplined in violation of R.C. 4113.52 may maintain a statutory cause of action for the violation, a common-law cause of action in tort, or both, but is not entitled to double recovery." *Id.* at syllabus. Accordingly, "[d]espite the existence of statutory enforcement measures within the act itself, Ohio courts recognize the public policy favoring whistleblowing embodied in Ohio's Whistleblower Act as a basis for a common law wrongful discharge in violation of public policy claim." *Avery v. Joint Twp. Dist. Mem'l Hosp.*, 286 F. App'x 256, 261 (6th Cir. 2008) (citing *Kulch*, 677 N.E.2d at 322).

The Court is therefore persuaded by Steed's citation to *Wells*. In *Wells*, the defendant, like Defendants here, argued that the plaintiff could not establish the jeopardy element "by using Ohio's whistleblower statute as its source of public policy." *Wells*, 2023 U.S. Dist. LEXIS 159949 at *8. The *Wells* court disagreed. While recognizing the general rule that certain statutory schemes cannot satisfy the jeopardy element as a matter of law, the *Wells* court correctly identified that "the Supreme Court of Ohio has not made a similar determination with respect to the State's whistleblower statute contained in Ohio Rev. Code § 4113.52." *Id.* at *11 (citing *Kulch*, 677 N.E.2d at 324).

Defendants are wrong when they assert that *Wells*' holding "conflicts with the Sixth Circuit's clear statement of law that 'Ohio common law does not recognize an action for wrongful discharge where a statutory remedy exists.'" (Doc. No. 27, PageID #787 (citing *Carrasco v. NOAMTC Inc.*,

124 F. App'x 297, 298 (6th Cir. 2004)).)  The Sixth Circuit's decision in *Carrasco* is irrelevant here. It is true that in *Carrasco* the Sixth Circuit stated that "Ohio common law does not recognize an action for wrongful discharge where a statutory remedy exists," but that statement of law is incomplete.   In a more recent case, the Sixth Circuit applied *Kulch* and found that Ohio's Whistleblower Act can serve "as a basis for a common law wrongful discharge in violation of public policy claim."   *Avery*, 286 F. App'x at 261.   Further, the *Carrasco* court did not address the whistleblower statute and instead found that the plaintiff could not maintain a wrongful discharge claim based on Title VII or Ohio's civil rights statutes.   *Id.* at 305.  Put simply, *Kulch* remains good law in Ohio and the Sixth Circuit's unreported opinion in *Carrasco* does not change that fact. *Koprowski v. Baker*, 822 F.3d 248, 252, n.1 (6th Cir. 2016) ("unpublished opinions do not bind us"); *Metz v. Unizan Bank*, 649 F.3d 492, 496 (6th Cir. 2011) ("In reviewing the exercise of diversity jurisdiction, we are bound to apply Ohio law in accordance with the currently controlling decisions of its highest court").[4]

In sum, Ohio's whistleblower statute can serve as a basis for wrongful discharge claim.   That is precisely what Steed alleges in the Second Amended Complaint.   Steed alleges that her "termination under the circumstances described herein jeopardizes public policies protecting the rights of individuals who report their reasonable suspicions of criminal activity, precisely as Steed did in this case."  (Doc. No. 17, ¶ 199.)  The Court therefore rejects Defendants' argument that Steed has not alleged the jeopardy element of her wrongful discharge claim.

The Court, however, finds that Steed has not alleged the jeopardy element for Ohio Revised Code § 2921.12.  Even if Ohio courts would recognize Ohio Revised Code § 2921.12 as representing

---

[4] Despite the *Wells* court relying on *Kulch*, Defendants do not even address *Kulch* in their briefing.

a clear public policy of Ohio sufficient to sustain a wrongful discharge claim, Steed has not alleged that the "circumstances like those involved in [her] dismissal would jeopardize the public policy" contained in Ohio Revised Code § 2921.12.  Ohio Revised Code § 2921.12 is a criminal statute generally prohibiting the tampering with evidence.  Steed has only alleged that her termination "jeopardizes public policies protecting the rights of individuals who report their reasonable suspicions of criminal activity."  (Doc. No. 17, ¶ 199.)  There is simply nothing in Ohio Revised Code § 2921.12 that pertains to those who "report their reasonable suspicions of criminal activity."  Thus, Steed's wrongful discharge claim fails to state a claim on the basis of Ohio Revised Code § 2921.12.

**B.    Steed's Second Amended Complaint sufficiently alleges a defamation claim**

Defendants next move to dismiss Steed's defamation claim.  Defendants assert that there are four categories of statements alleged in the Second Amended Complaint that fail as matter of law: (1) "Individual Defendants relaying the statements of others in carrying out their legal duties that, even if they were defamatory, are protected by the qualified privilege," (2) "[a]lleged statements that lack any factual substance or context," (3) "[t]he release of public records that are not alleged to be false," and (4) "[s]tatements of opinion and not fact."  (Doc. No. 19-1, PageID #713.)  The Court analyzes the parties' arguments concerning each category below.

**1.    Statements protected by qualified privilege**

In their Motion, Defendants argue that "[t]he Individual Defendants cannot be liable for defamation for statements made when discharging their duties."  (Doc. No. 19-1, PageID #713.) Defendants assert that Steed's allegation concerning statements made to MetroHealth Board and Board liaison "meet the requirements for the application of qualified privilege" because they "were made in the discharge of their duties as MetroHealth executives and Board members."  (*Id.* at PageID #713–14.)  Defendants assert, without citation, that "Dr. Steed does not demonstrate or provide any

25

supporting allegations to establish that any of these statements were made with actual malice" because "[h]er conclusory allegation that the statements were 'all false and were made with actual knowledge or with reckless disregard for their truth or falsity' is simply not enough."  (*Id.* at PageID #715.)

In her Opposition, Steed argues that "even if Steed had alleged that those defamatory statements were made in the course of Defendants' professional or ethical duties, 'a speaker loses the qualified privilege if his or her statement is made with actual malice, which includes knowledge of falsity.'"  (Doc. No. 26, PageID #774.)  Pointing to Paragraphs 213 and 222 of the Second Amended Complaint, Steed asserts that she "has alleged malice."  (*Id.*)

In their Reply, Defendants argues that "Dr. Steed concedes that the alleged defamatory statements are presumptively privileged."  (Doc. No. 27, PageID #789.)  Defendants also argue that Steed's allegations of actual malice are insufficient to survive a Rule 12(b)(6) challenge.  (*Id.*)

Defendants have not cited any authority for why statements "made in the discharge of their duties as MetroHealth executives and Board members" are subject to qualified privilege under Ohio law.  Nevertheless, Defendants are correct.  Under Ohio law, "communications between an employer and an employee or between two employees concerning the conduct of a third or former employee made in good faith concerning a matter of common interest are within the doctrine of qualified privilege."  *Green v. Fid. Invs.*, 374 F. App'x 573, 579 (6th Cir. 2010) (quoting *Gaumont v. Emery Air Freight Corp.*, 572 N.E.2d 747, 755 (Ohio App. 2d Dist. 1989)); *Yacko v GM Co.*, No. 1:23-cv-01578-PAB, 2024 U.S. Dist. LEXIS 34780 at *32 (N.D. Ohio Feb. 28, 2024).

Under this rule, Defendants request the Court find that the following statements are subject to qualified privilege:

217. Defendants Rajki, McBride, Partington, Barre, and Rose repeated false allegations such as claims that Steed used private drivers and planes improperly,

improper hiring practices, having multiple DUIs and excessive drinking, all of which were false, frivolous and defamatory.

* * *

219. Upon information and belief, Defendant Rose solicited complaints against Steed from MetroHealth employees, including sharing the Board's contact information for employees to contact those Board members directly, and informed the MetroHealth Board of all negative information she allegedly "learned" about Steed without conducting any investigation into the truth of such allegations.

220. Upon information and belief, Defendant Moss falsely informed other MetroHealth Board members that Steed was colluding with Boutros, which was a false statement.

(Doc. No. 17, ¶¶ 217, 219–220.)  Even assuming that these alleged statements are protected under

qualified privilege, the Second Amended Complaint sufficiently alleges actual malice.

As this Court recently explained:

If a qualified privilege exists, the privilege can be lost if the communication is not "made in a reasonable manner and for a proper purpose," or is made to "someone outside of the qualified privilege." *Bisbee v. Cuyahoga Cnty. Bd. of Elections*, 2001 WL 204174, at *5 (Ohio App. 8th Dist. Mar. 1, 2001); *Stearns v. Ohio Sav. Ass'n*, 15 Ohio App. 3d 18, 15 Ohio B. 39, 472 N.E.2d 372, 374 (Ohio App. 8th Dist. 1984); *Burrows v. Fuyao Glass Am. Inc.*, 2017 WL 626189, at *8 (S.D. Ohio Dec. 8, 2017). The privilege can also be lost when a plaintiff alleges actual malice. *Costanzo*, 403 N.E.2d at 983.

"Actual malice" is present when a statement is made "with the knowledge that the statements are false or with reckless disregard of whether they were false or not." *Id. See also Smith v. Klein*, 23 Ohio App. 3d 146, 23 Ohio B. 387, 492 N.E.2d 852, 856-57 (Ohio App. 8th Dist. 1985); *Jacobs v. Frank*, 60 Ohio St. 3d 111, 573 N.E.2d 609, 614 (Ohio 1991). "Reckless disregard" applies when "a publisher of defamatory statements acts with a 'high degree of awareness of their probable falsity,' or when the publisher 'in fact entertained serious doubts as to the truth of his publication." *City of Columbus*, 883 N.E.2d at 1064 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964), and *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968)) (internal citations omitted).

*Yacko*, 2024 U.S. Dist. LEXIS 34780 at *32–33.

Contrary to Defendants' arguments, Steed does more than allege legal conclusions. Steed alleges that Defendants, (either individually or collectively), sought to "undermine" Steed, created "division" between the board, "solicit[ed] frivolous complaints," "spearhead[ed] a smear campaign," "falsely" informed the board of certain facts,  relied on "anonymous" complaints without "tak[ing] any steps to investigate their truth," "did not conduct any due diligence to determine if the allegations had merit," and "weaponize[ed]" Defendant Rose.  (Doc. No. 17, ¶¶ 25, 31, 34, 37, 220.)  Viewing these allegations in the light most favorable to Steed, Defendants took affirmative steps to disparage Steed's character with actual knowledge that the statements were false.

As explained by the Ohio Court of Appeals: "[a] failure to investigate the truth or falsity of a publication, even when a reasonably prudent person would have done so, may raise an issue of negligence, but it does not demonstrate actual malice unless the plaintiff first establishes that the defendant had a high degree of awareness of probable falsity, had serious doubts as to the truth of the statements, or purposefully avoided the truth." *Burns v. Rice*, 813 N.E.2d 25, 38 (Ohio App. 10th Dist. 2004) (citing cases); *Young v. Gannett Satellite Info. Network, Inc.*, 734 F.3d 544, 548 (6th Cir. 2013) ("[A]lthough failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category").  At a minimum, viewing the allegations in the Second Amended Complaint in the light most favorable to Steed, the allegations plausibly suggest that Defendants "purposefully avoided the truth" or that they had "a high degree of awareness of probable falsity."

While Defendants may ultimately be able to prove that they "acted to fulfill their responsibilities to MetroHealth," Steed alleges a different story, supported by plausible allegations. The Court therefore declines to dismiss any portion of Steed's defamation claim based on Defendants'

28

qualified privilege defense.

### 2.    Statements that lack any factual substance of context

In their Motion, Defendants next assert that two alleged statements cannot form the basis for Steed's defamation claim because they lack factual substance of context.  Defendants argue that "Dr. Steed alleges as defamation 'statements by Defendant Walker at internal MetroHealth Board meetings and Foundation Board meetings,'" but "there is no content or context as to what the statements were," whether those statements "were either false or factual," and "there is no indication what [the] statements were."  (Doc. No. 19-1, PageID #716.)  Defendants then argue that "her allegations that Defendant Rose 'harassed' Dr. Steed . . . do not qualify as statements of fact made by Defendant Rose that have factual content, nor are they verifiable."  (*Id.*)  Steed does not specifically respond to this argument in her Opposition.  Defendants argue in their Reply that "[h]aving failed to respond, Dr. Steed has conceded that these statements or conduct are not defamatory."  (Doc. No. 27, PageID #793.)

As this Court explained in *Yacko*:

While a defamation complaint must allege the substance of the allegedly defamatory statements," "they need not be set out verbatim." *Doe v. Univ. of Dayton*, 2018 WL 1393894, at *5 (S.D. Ohio Mar. 20, 2018) (citing *Hedrick v. Ctr. for Comprehensive Alcoholism Treatment*, 7 Ohio App. 3d 211, 7 Ohio B. 272, 454 N.E.2d 1343 (Ohio 1982)). Thus, a plaintiff at the Rule 12(b)(6) stage need only allege that a defamatory statement was false to survive dismissal. *See Swartz v. DiCarlo*, 2014 WL 8097138, at *3 (N.D. Ohio Oct. 21, 2014), *report and recommendation adopted sub nom. Swartz v. Di Carlo*, 2015 WL 1022073 (N.D. Ohio Mar. 6, 2015) (finding sufficient allegations that defendant's statements were "false" and "not true"); *Prior v. Mukasey*, 2008 WL 5076821, at *2 (N.D. Ohio Nov. 21, 2008) (dismissing defamation claim because plaintiff only alleged that statements were "[u]nflattering" and "embarrassing . . . but not false"); *Baez v. City of Cleveland*, 2020 WL 5982301, at *5 (N.D. Ohio Oct. 8, 2020) (finding defamation claim insufficiently pleaded where plaintiff did "not allege that the [statement] was false").

*Yacko*, 2024 U.S. Dist. LEXIS 34780 at *21. Applying this standard, the Court agrees with Defendants. The two allegations that Defendants argue lack substance are:

> 210. Upon information and belief, Defendant Rose harassed Steed and sought to investigate Steed's travel expenses, attempting to find fault with Steed's travel to no avail.
>
> 214. Examples of other defamatory statements made about Steed include, but are not limited to . . . statements by Defendant Walker at internal MetroHealth Board meetings and Foundation Board meetings.

(Doc. No. 17, ¶¶ 210, 214.) The Court agrees with Defendants that Paragraph 210 does not allege a defamatory statement. But this Court's reading of Paragraph 210, particularly in conjunction with other allegations in the Second Amended Complaint, demonstrates to it that Steed is not alleging a "statement." Indeed, Steed has not argued that Paragraph 210 was intended to allege a defamatory statement. If anything, this allegation just gives context to Defendant Rose's motive in making defamatory statements alleged in the Second Amended Complaint. (*See id.* at ¶ 221 ("Defendant Moss and Defendant Rose spread false information about Steed's travel frequency and expenses to others at MetroHealth"); *see also id.* at ¶ 37 ("Defendant Rose perpetuated and aided the wrongful conduct and toxic work environment, including soliciting frivolous complaints among MetroHealth employees, distributing Board members' contact information to MetroHealth employees to provide comments about Steed, and spearheading a smear campaign against Steed"); *Id.* ("Defendant Rose was weaponized to create disruption, interference, and division between Steed and the Board").)

Similarly, the Court finds that the statements alleged in Paragraph 214 cannot sustain a defamation claim. While Paragraph 214 alleges Defendant Walker made "defamatory statements" at board meetings, Steed does not set forth what those statements are or describe the substance or subject matter of the statements. Thus, Steed's defamation claim cannot proceed based on Defendant

30

Walker's statements "at internal MetroHealth Board meetings and Foundation Board meetings." *See MXR Imaging, Inc. v. Zavagno*, No. 1:24CV1269, 2025 U.S. Dist. LEXIS 40204, at \*19 (N.D. Ohio Mar. 6, 2025) ("The lack of any description of the substance of the alleged defamatory statements requires dismissal of Plaintiff's defamation claim in this instance"); *Hous. Opportunities Made Equal of Greater Cincinnati v. Count X, LLC*, No. 1:24-cv-308, 2025 U.S. Dist. LEXIS 65857, at \*16 (S.D. Ohio Apr. 7, 2025) (dismissing defamation claim when "Defendants have not plausibly alleged *what* defamatory matter Plaintiffs communicated to *which* third party").

The Court therefore dismisses Steed's defamation claim based upon the alleged statements in Paragraph 210 of the Second Amended Complaint and the alleged "statements by Defendant Walker at internal MetroHealth Board meetings and Foundation Board meetings," which are alleged in Paragraph 214 of the Second Amended Complaint.

### 3.   The release of public records that are not alleged to be false

In their Motion, Defendants assert that "Dr. Steed complains that the Board 'leaked' Dr. Steed's travel expenses as CEO of MetroHealth to the press following Dr. Steed's termination." (Doc. No. 19-1, PageID #717.)  They claim that "MetroHealth could not have 'leaked' Dr. Steed's travel expenses because they are a public record subject to disclosure under the Ohio Public Records Act."  (*Id.*)  They assert that "Dr. Steed does not allege that the public record data regarding her expenses are in any way false" and instead, according to Defendants, she complains about hypothetical statements to the press without actually identifying so much as a misleading statement." (*Id.*)  Defendants conclude that "[t]he travel expenses speak for themselves and as the identified 'statement of fact' is one of truth."  (*Id.*)

In her Opposition, Steed makes a blanket argument that she "alleged that all of Defendants'

31

allegedly defamatory statements were false and made with malice." (Doc. No. 26, PageID #773.) In their Reply, Defendants assert that they "put Dr. Steed on notice that allegations about her travel expenses were not actionable because they concern public records that speak for themselves." (Doc. No. 27, PageID #793.) According to Defendants, by failing to respond "Dr. Steed has conceded that these statements or conduct are not defamatory." (*Id.*)

The Court rejects Defendants' waiver argument. Defendants rely on *Humphrey v. United States AG Office*, 279 F. App'x 328, 331 (6th Cir. 2008) where the plaintiff did not oppose the defendant's motion to dismiss before the district court. That, of course, is not the case here. While Steed's arguments could be more developed, she did respond to Defendants' truth argument by asserting that "all of Defendants' allegedly defamatory statements were false and made with malice." (Doc. No. 26, PageID #773.)

Defendants' citation to the undersigned's decision in *DG Gas, LLC v. Ta Franchise Sys. LLC*, No. 1:24-cv-01002-PAB, 2025 U.S. Dist. LEXIS 47159, at *76 (N.D. Ohio Mar. 14, 2025) likewise does not compel a finding of waiver. While the undersigned found that the plaintiff in that case had waived its opposition to a certain argument, the undersigned (1) fully analyzed the defendants' argument; and (2) declined to dismiss the complaint after doing so. *See id.* at *76–79. Consistent with its approach in *DG Gas*, this Court will assume that Steed waived any opposition to Defendants' truth arguments, will fully evaluate Defendants' arguments.

After fully considering Defendants' argument, the Court rejects Defendants' truth argument at this stage of the case. Defendants appear to be arguing that Steed's travel expenses are truthful because they are contained in a public record. Defendants have not offered any authority supporting that argument. Indeed, if that argument was correct, a government entity could intentionally produce

defamatory information in response to a public records request and would be shielded from liability. Such a result would be absurd and has been rejected by at least two Ohio Courts of Appeals. *See Mehta v. Ohio Univ.*, 958 N.E.2d 598, 614 (Ohio App. 10th Dist. 2011) ("Upon conducting our own research, we concur with appellant's position that there is no legal authority in Ohio providing for blanket immunity from defamation for any and all content included within a public record"); *see also Jamison v. Galena*, 38 N.E.3d 1176, 1192 (Ohio App. 5th Dist. 2015) (following *Mehta*, reversing summary judgment in favor of an Ohio village, and concluding that the plaintiff's "defamation claim does not fail, as a matter of law, simply because the letter was provided to the reporter via a public records request").  The Court has found no contrary authority.  *Cf. Missionaries of the Sacred Heart, Inc. v. Ohio Dept's of Youth Servs.*, 167 N.E.3d 964, 967 (Ohio 2021) (Brunner, J., dissenting) ("Ohio's appellate courts have held that producing a public record in response to a public-records request may satisfy the publication element to support a claim for defamation").

The Court likewise disagrees with Defendants assertion that "Dr. Steed does not allege that the public record data regarding her expenses are in any way false."  Steed expressly alleges:

> 206. Upon information and belief, the MetroHealth Board leaked Steed's travel expenses as CEO of MetroHealth to the press following the termination of her Employment Agreement.

> 207. Steed's termination was not for cause and could therefore not have related to travel expenses. Accordingly, any such statements to the press implying that Steed was terminated as a result of travel time or expenses is inaccurate and defamatory, attempting to unfairly cast blame on Steed for her termination which was in truth a termination without cause.

> * * *

> 221. Upon information and belief, Defendant Moss and Defendant Rose spread false information about Steed's travel frequency and expenses to others at MetroHealth.

33

222. These statements were all false and were made with actual knowledge or with reckless disregard for their truth or falsity.

(Doc. No. 17, ¶¶ 206–07, 221–22.) Put simply, Steed alleges that Defendants published false information concerning Steed's travel expenses.

Defendants may have a viable truth defense regarding whatever information (whether through a public records request or otherwise) they provided to the press (if at all). But that is for another day. The Court therefore declines to dismiss Steed's defamation claim concerning statements regarding her travel expenses.

### 4. Statements of opinion and not fact

In their Motion, Defendants argue that statements alleged in Paragraphs 142 and 147 of the Second Amended Complaint "are clear statements of opinion." (Doc. No. 19-1, PageID #718.) Defendants assert that "[f]ar from constituting false and disparaging facts . . . these statements are protected opinions made on behalf of MetroHealth" because "[s]tatements like '[w]e believe Steed's performance is not meeting the needs of MetroHealth' . . . and 'we lost confidence. . . and felt we had no choice' . . . merely reflect the Board's assessment regarding Dr. Steed's performance." (*Id.*) According to Defendants, "[i]t is their opinion, not a verifiable fact, and therefore not actionable under a defamation claim." (*Id.*)

In her Opposition, Steed argues that she "alleges that Walker knew that performance was not the actual reason for MetroHealth's termination of her." (Doc. No. 26, PageID #775.) According to Steed, she "alleges that Walker made a statement of fact, specifically, that MetroHealth terminated her for performance after apprising her of performance deficiencies." (*Id.*) Steed asserts that "[w]hether MetroHealth terminated Steed for performance is the critical issue of this lawsuit, and, like the issue of whether MetroHealth ever counseled Steed on her performance, capable of being

34

verified and, as such, not opinion." (*Id.*) Steed argues that "[c]reating a post hoc stated reason for termination, that harms an employee's professional standing, out of (to borrow Defendants' idiom) whole cloth, when the speaker knows that stated reason is false is defamatory, not opinion." (*Id.*)

Defendants argue in their Reply, "[t]hat the MetroHealth Board may not have communicated all its issues with Dr. Steed's performance (it did) does not negate that, in their opinion, her performance was subpar." (Doc. No. 27, PageID #792.) They assert that "Dr. Steed does not allege that Dr. Walker ever represented that her termination was for cause." (*Id.*) Defendants argue that "[t]he MetroHealth Board's undisputed decision to pursue a no-cause termination, however, says little—if anything—about the quality of Dr. Steed's performance," and instead, "it simply means that the MetroHealth Board decided to pursue the termination of an at-will employee through one of the two avenues outlined in an employment agreement." (*Id.*)

As explained by the Sixth Circuit:

An opinion cannot give rise to a defamation claim under Ohio law. *See Wampler v. Higgins*, 93 Ohio St. 3d 111, 2001- Ohio 1293, 752 N.E.2d 962, 971 (Ohio 2001). Whether a statement is fact or opinion is a question of law for the court to decide. *Id.* at 976-78.

Four considerations guide our analysis: "the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared." *Vail v. Plain Dealer Publishing Co.*, 72 Ohio St. 3d 279, 1995-Ohio-187, 649 N.E.2d 182, 185 (Ohio 1995). These considerations turn on "the reasonable reader's perception of the statement—not on the perception of the publisher." *McKimm v. Ohio Elections Comm'n*, 89 Ohio St. 3d 139, 2000- Ohio 118, 729 N.E.2d 364, 371 (Ohio 2000).

*Croce v. Sanders*, 843 F. App'x 710, 713–14 (6th Cir. 2021). When assessing the four factors, "[e]ach factor is to be addressed, 'but the weight given to any one will conceivably vary depending on the circumstances presented.'" *Boulder v. Woods*, 917 F.3d 471, 479 (6th Cir. 2019) (quoting *Vail*, 649 N.E.2d at 185).

Neither party (aside from Defendants' passing mention of the test in their Reply) analyzes the four-factor test in their briefing.  After applying the four-factors, the Court concludes that Paragraphs 142 and 147 do not allege non-actionable opinion.  Paragraphs 142 and 147 of the Second Amended Complaint read as follows:

> 142.  Following Steed's termination "not for cause", MetroHealth, through Defendant Walker, issued a defamatory public statement indicating that Steed's termination was in fact "for cause", stating:
>
>> It has become clear that the Board and Steed fundamentally disagree about the priorities and performance standards needed from our CEO for MetroHealth to fulfill its mission . . . [w]e believe Steed's performance is not meeting the needs of MetroHealth. As a result, we have lost confidence in her ability to lead the organization going forward and believe it would not be in the best interest of the System for her to continue in her position. Therefore, we are exercising our right to terminate her at-will contract. . . .
>>
>> We had high expectations when she arrived in 2022 and are sorry those expectations have not been met[.]
>
> 147.  Defendant Walker and the Board continued with their attempts to wrongly assassinate Steed's character, and Defendant Walker issued a second statement doubling down on this position to SignalCleveland, stating:
>
>> This was purely an issue of the CEO's failure to perform and entirely based on her direct interactions with the Board of Trustees. . . The performance issues that caused us to act are long-standing and were made clear to her on numerous occasions. She failed for months to address them. Because of that, we lost confidence in her ability to lead the System and felt we had no choice but to end her at-will employment agreement.

(Doc. No. 17, ¶¶ 142, 147.)

At first glance, the "specific language used" in Paragraph 142 can be interpreted as constituting or being statements of opinion.  Phrases like "we believe" and "we … believe it would not be in the best interest" connote opinion and Defendants' beliefs are not something that are

36

verifiable.  However, Ohio law requires the Court to analyze "the general context of the statement," along with its "broader context."  Later in the Second Amended Complaint, Steed alleges as follows.

> 204. Following the unlawful termination of Steed's Employment Agreement, Defendants issued false statements in Press Releases disparaging Steed accusing her of performance issues, which was not only published locally but also nationally.
>
> 205. These false and disparaging statements are in direct conflict with the actual facts about Steed's job performance, during which time she earned 121% of her performance-based compensation in April 2024 following a commendable performance review in March 2024. These false and disparaging statements are also factually inaccurate because the "for cause" reasons given to the media and public at large are inconsistent with the explicit representation communicated that the Board elected to terminate the Employment Agreement "without cause."

(Doc. No. 17, ¶¶ 204–05.)   Steed does not take issue with the specific statements concerning Defendants' beliefs, but instead takes issue with statements concerning her job performance and statements that she was terminated for cause, which she alleges are false.  Further, the Court cannot examine the full context of the statements alleged in Paragraph 142 because the quoted statement is not reproduced in the Second Amended Complaint and Steed alleges that Defendants "issued a defamatory public statement indicating that Steed's termination was in fact 'for cause.'"  Thus, the Court cannot say, at this stage, that the alleged statements in Paragraph 142 are inactionable opinion.

The Court reaches the same conclusion with regard to the statements alleged in Paragraph 147.  The specific language used does not entirely connote opinion.  Steed alleges that Defendants stated that "[t]his was purely an issue of the CEO's failure to perform and entirely based on her direct interactions with the Board of Trustees."  That alleged statement does not use words like "we believed that Steed failed to perform" or that "in our assessment, Steed failed to perform."  Further, Steed's failure to perform is something that could be verified by comparing her actual job performance with the expectations given to her by Defendants either verbally or in her employment contract.  And

37

again, the full publication has not been reproduced in the Second Amended Complaint, so the Court cannot say whether the statement to SignalCleveland did not include, as Steed generally alleges, a statement that she was terminated "for cause."   (Doc. No. 17, ¶ 205.)  Steed also alleges that "the Board never had any meetings or conversations with Dr. Steed about any alleged performance issues," which is a verifiable fact.  (*Id.* at ¶ 148.)

In sum, viewing these allegations in the light most favorable to Steed, the Court rejects Defendants' argument that the statements alleged in Paragraphs 142 and 147 constitute inactionable opinion.

## V.     Conclusion

For the reasons set forth herein, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.  The Court finds that Counts IV and V of the Second Amended Complaint state plausible claims for relief, except that, Steed's wrongful discharge claim fails to state a claim to the extent it is premised upon Ohio Revised Code § 2921.12, Steed's defamation claim fails to state a claim based upon the alleged statements in Paragraph 210 of the Second Amended Complaint, and Steed's defamation claim fails to state a claim based upon the alleged "statements by Defendant Walker at internal MetroHealth Board meetings and Foundation Board meetings," which are alleged in Paragraph 214 of the Second Amended Complaint.

**IT IS SO ORDERED.**

     *s/Pamela A. Barker*
     PAMELA A. BARKER
Date:  February 24, 2026     U. S. DISTRICT JUDGE